JOSEPH ANTWINE COUTURE *v.* STATE
OF MARYLAND

[No. 416, September Term, 1968.]

*Decided June 19, 1969.*

The cause was argued before MURPHY, C.J., and MORTON, ORTH, and THOMPSON, JJ.

*Charles Philip Brown* for appellant.

*Henry J. Frankel, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Samuel A. Green, Jr., State's Attorney for Baltimore County,* and *John J. Lewis, Assistant State's Attorney for Baltimore County,* on the brief, for appellee.

ORTH, J., delivered the opinion of the Court.

The appellant was found guilty at a court trial in the Circuit Court for Baltimore County of embezzlement and sentenced to be confined to the jurisdiction of the Department of Correction for the term of 5 years. He contends that the evidence was not sufficient to sustain the conviction. The contention involves the fine legal distinction between embezzlement and larceny and other lar-

cenous takings which has presented a dilemma to trial and appellate courts in all those jurisdictions in which such unlawful appropriations have been maintained as separate and distinct crimes.

The crime of which the appellant was convicted is that proscribed by Md. Code, Art. 27, § 129. We said in *Gordon v. State*, 5 Md. App. 291, 303:

> "Embezzlement is a statutory offense designed to penalize those fraudulent conversions of money and other personal property which could not be prosecuted at common law as larceny because there was no trespassory taking. See Clark & Marshall, *Crimes*, (6th Edition) Section 12:-18; Wharton's *Criminal Law & Procedure* (Anderson Edition), Section 514. While the crime in general consists of the fraudulent appropriation of personal property by a person to whom it has been entrusted, *League v. State*, 1 Md. App. 681, where an embezzlement statute such as Section 129 applies only to designated persons occupying particular relationships, it is essential in proving the offense to show the existence of such a relationship so as to bring the accused within the ambit of the statute. See Clark & Marshall, *Crimes*, Section 12:22, and Wharton, Section 514, and cases there cited.

> "By its express terms, Section 129 requires proof that the accused (a) was employed as a cashier, servant, agent, clerk or officer by a person or body corporate; (b) that in such capacity he received personal property 'for or in the name or on account of his master or employer'; and (c) that he thereafter fraudulently embezzled such property. The statute does not require that the embezzled property be entrusted to the accused directly by the master or employer; it may be entrusted by another person on his behalf."

Larceny is the physical taking and asportation, *animus furandi,* of personal property of another from the actual or constructive possession of the owner. *Loker v. State,* 250 Md. 677, 686-687, citing *Brown v. State,* 236 Md. 505, 513. Embezzlement is the fraudulent appropriation of personal property by a person to whom it was entrusted either by or for the owner. *Perkins, Criminal Law,* (1957), ch. 4, § 3B, p. 243. Stated simply the distinction between the two crimes is that in larceny the taking is by a trespass, actual or constructive, while in embezzlement the original taking was lawful. Trespass is not required in embezzlement, its place being supplied by the relation of trust and confidence between the parties. *Clark & Marshall, Law of Crimes,* 6th Ed., § 12:18, p. 799.

The appellant was charged with embezzling $889.56 from Shell Oil Company, t/a Pulaski Highway Shell, on 19 May 1968. The only evidence in the case was the testimony of Roland W. Miles, "an assistant branch manager for Employers Overload Company, who is a temporary labor contractor or sub-contractor for the Shell Oil Company." In that capacity, since 2 May 1968, he operated a station for Shell Oil Company of Maryland located at 9605 Pulaski Highway in Baltimore County, trading under the name "Pulaski Highway Shell." The appellant was in his employ "as manager of the unit." As such, the appellant's duties were "daily bookkeeping, running the station, cleanliness, driveway service, handling all books, deposits, money, credit cards, anything." He was so working on 19 May. The handling of funds received by the station was his sole responsibility; "just after each shift, each man would clean out, and then all the money would be either deposited or turned over to the manager." Miles testified:

"Well, on that Monday there, (20 May 1968) I went down to the station, and I talked with Mr. Couture about seeing how everything was going—I periodically check the stations—due to

the fact that he was a new man and he wasn't too familiar with the book work, so I had worked with him prior to this and tried to train him on this, which I do with other managers. I questioned Mr. Couture about the weekend receipts, and he informed me that they were in the bank, and the paper work was not made up for the 18th or the 19th; the 17th's paper work was finished by Mr. Couture. As I stated, the 18th and 19th was not, and he informed me that he would make them up, and the money was in the bank, the night depository was in the bank, so I left it go at that. * * *

After that I left the unit. Mr. Couture was there, and he informed me that he would finish the book work and go to the bank the next day and make a deposit. The next morning the attendant due to report there at 7:00 o'clock, along with Mr. Couture, showed up and called me and told me that Mr. Couture had not showed up. I waited to hear from Mr. Couture. I did not hear from him. I did not have any contact from anybody in regard to him, so I left it go by. I thought, maybe, he was in sick and couldn't get in touch with me. The next day I waited for him to come in, and he didn't show up. I went down there the next morning, down the bank, and the teller down the bank told me * * *."

What the teller told him was stricken on objection. Miles then explained the records maintained by the station manager.

"This report here is a D-9 sale, they call it. What it shows, it shows the whole day's business combined for the whole day. We run three shifts, 7:00 to 3:00, 3:00 to 11:00 and 11:00 to 7:00, and it is combined into one, and it is the responsibility of the manager to fill this report out and deposit all the moneys what is supposed

to be there and credit cards, and mail the report away and mail the credit cards away to certain locations where they go."

They are kept daily, made up for the business transacted the day before. The report for 17 May was made out by the appellant. "When I was down to see him on the Monday there, he was two reports behind" for 18 and 19 May. Miles said:

"I reconstructed, due to the fact that there were no records there in the station except for the copies of these here, I took the closing meter readings from the 17th's report, and they would be the opening meter readings for the 18th and 19th—I had to combine them—and then the closing meter readings for the 20th, and figured out my sales, and worked it up from there. * * * And took—found out how much motor oil was served and worked up the sales sheet from there."

He arrived at how much motor oil was served by what other men in the station said and took an inventory, arriving at the oil consumption—"This was what was gone. Now, there was another shortage which is irrelevant to this case altogether, and we knew how much this was, and this is how we subtracted this from that, and that is how we came up where we was going." He explained this by stating he took the closing oil figure from the report of 17 May, took an inventory of the oil on hand and determined that on 18 and 19 May five and three quarters gallons of oil were used. Apparently the gasoline used was ascertained from meter readings and was found to be 146 gallons. Asked "what was the actual value of that", he said, "The total was seven ninety-eight eighty three". Asked shortly thereafter what was the total sum involved he said that it was $798.83 on the gasoline and motor oil.[1] He also said that each shift started with petty cash

1. The record does not disclose how 5¾ gallons of oil and 146 gallons of gasoline would result in cash receipts of $798.83.

of $50 charged to the manager; "I bring him the money * * * nobody else becomes involved in this, just the manager alone." When the appellant did not show up for work Miles went over the records and found receipts for the petty cash. The petty cash and the money for the gasoline and oil totaled $889.56. Miles said this money was not deposited in the bank to his account. Up to 6 May, while the appellant was "in training" Miles made the deposits. From that point on it was the responsibility of the appellant to make them. The $889.56 representing receipts for 18 and 19 May had not been deposited,[2] although the appellant had told him on 20 May that it was in the bank.

On cross-examination it was elicited that the station was worked in three shifts, 7:00 to 3:00, 3:00 to 11:00 and 11:00 to 7:00, each of which was the responsibility of the appellant. The money received by "the 3:00 to 11:00 shift" was not turned over to him. "It is supposed to be deposited in the bank, but Mr. Couture informed the men not to deposit it. * * * On the 3:00 to 11:00 shift it is either deposited in the night depository or is turned over to the 11:00 to 7:00 to give to the manager the next morning." Miles had no records with respect to "the 3:00 to 11:00 shift—Mr. Couture had them in his car, I guess." At the end of each shift "the meters are taken, everything is counted, inventoried, and all the sales are totaled for that period" by the attendants on duty at that shift. "Then the money is supposed to be put in the night depository, and the next day the manager goes up to the

---

2. He had described the procedure: "We in the station, we make up the deposit slip; go to First National Bank; make the deposit. Then they, in turn, notify New York Data Center, Shell Oil Company, New York Data Center, that the deposit has been made and the amount. Then they, in turn call me if, you know, there is anything wrong, if it is short or over or whatever." If there was a shortage "they would either call me by telephone or they would send down a D68A issuing a shortage for this amount." Objections to evidence as to what notification was received by Miles from the New York Data Center with reference to the deposit of $889.56 were properly sustained by the court in view of the manner in which the evidence was attempted to be elicited or offered.

bank and pulls the money out and makes up—deposits it, and makes his total deposit * * * when we put it in a night depository, it doesn't get deposited until the next day." That was the practice with the first shift—7:00 to 3:00 and the second shift—3:00 to 11:00 and the third shift—11:00 to 7:00. The manager goes to the bank each morning and makes the deposit for the final report. The cash from each shift is put in a bag provided by the bank, "a regular bank bag" with the account identification number on it "SI 201." The bag is locked and "stays locked until the next morning when the manager comes and opens it up and makes his deposit." So when the manager went to the bank there should be three bags which had been placed in the night depository. "But Mr. Couture was not having the man make the deposits at night-time"—the 3:00 to 11:00 and the 11:00 to 7:00 shift. The 3:00 to 11:00 shift was turning the money over to the 11:00 to 7:00 shift and "then it would be turned over to Mr. Couture, and Mr. Couture on the 7:00 to 3:00 shift was also supposed to deposit his money, which he did not." Miles did not have a shift check sheet for 17 May—"they were in the station. They were gone with the records." Nor did he have one for 15 May. They were supposed to be kept in a folder in a drawer in the station. The other shortage to which Miles had referred in his direct testimony involved another employee. "It was in mileage money they had. They were giving away dollars, and you know, stuff like that." The appellant was also supposed to keep an "E. K. Williams book"; a record that stays in the station; "it is what they make these up off of" (apparently the reports). It was also gone. On 20 May the appellant told Miles everything was fine, no problems but "I asked him * * * about his book work being done, and he informed me it wasn't done." Miles said the bank deposit slips came in four parts. "The Teller keeps two, we mail one to New York and one stays in the station." Apparently there were none found in the station for 18 and 19 May.

The appellant was convicted under the first count in the indictment returned against him. It charged, using a formula stated to be sufficient in Md. Code, Art. 27, § 130, that he "did unlawfully embezzle from Shell Oil Company, t/a Pulaski Highway Shell, the sum of eight hundred and eighty-nine dollars and fifty-six cents current money of the United States, in violation of Art. 27, § 129 of the Annotated Code of Maryland, 1957 Ed." In determining the sufficiency of the evidence the first inquiry is whether the evidence established that the appellant was within the particular relationships designated by § 129: was he a cashier, servant, agent, officer, or clerk to any person or body corporate or was he employed for the purpose or in the capacity of a cashier, servant, agent, officer or clerk, by any person or body corporate? See 2 *Wharton's Criminal Law and Procedure* (Anderson), § 526, p. 209. We think it clear from the evidence that he was within these designations. But to prove the charge as alleged, the evidence had to show that the appellant occupied such relationship with Shell Oil Company (Shell), for the statute provides that a person occupying such relationships shall be deemed to have feloniously stolen money *"from his master or employer"* when he has embezzled money "which shall be delivered to or received, or taken into possession by him, for or in the name or on account of *his master or employer."* The evidence showed that a station, Pulaski Highway Shell, was operated for Shell by Employers Overload Company (Overload) ; that Overload was "a temporary labor contractor or sub-contractor" for Shell; that the responsibility for the operation of the station was in Miles, as "an assistant branch manager" for Overload; and that the day to day operation of the station was by the appellant, employed by Overload as the "manager of the unit." The record is silent as to the exact nature and terms of the relationship between Shell and Overload. We note that Miles referred to the appellant on occasion as "my manager" and he was at times referred to by the State in examining Miles as "your manager." In rendering its

verdict the lower court stated that it was uncontradicted that the appellant, as manager of the station, "was charged with certain specific fixed duties, and that among these duties was the taking to the bank, ultimately, at least, getting from the bank's night vault the bags that were supposed to have been put there by other people, and making the necessary deposits in the company bank account." But it made no factual finding as to the relationship between the appellant and Shell. We are unable to find from the evidence, directly or by rational inference, that the appellant was the cashier, servant, officer, or clerk to Shell or that he was employed for such purpose or in such capacity by Shell. On the contrary, the evidence was that he was the employee of Overload.

There remains whether the evidence was sufficient to show an agency relationship between the appellant and Shell. We think that the servant and master relationship that existed between the appellant and Overload did not necessarily preclude the existence of an agent and principal relationship between the appellant and Shell. As used in embezzlement statutes the term agent "is interpreted in its ordinary sense in which it is employed in the agency law as applying to a person who is authorized to act for and on behalf of his principal in the making of contracts or the conduct of business with third persons, whether such other person be a private individual or a public or private corporation. In accordance with the general principles relating to the law of agency, it is immaterial whether the agent receives any compensation, and whether his services are continuous or occasional or even limited to merely one act." 2 *Wharton's Criminal Law and Procedure* (1957), § 527, p. 210. There is also authority to the effect that "where one is employed for certain purposes as the agent of another, he is nonetheless an agent for committing an act of embezzlement, although his employer is himself an employee and must in turn account to a third person. However, a subagent, whose appointment by the agent was not authorized by the principal, is not an agent of the principal and sub-

ject to an embezzlement prosecution for appropriation of the principal's money." 29 A C.J.S. § 15, p. 43. But, as we have stated, the terms of the relationship between Shell and Overload do not appear in the record; the evidence does not show that Shell authorized the appointment of the appellant as its agent. The term agent "imports a principal and implies employment, service and delegated authority to do something in the name and stead of the principal—an employment by virtue of which the money or property embezzled came into the agent's possession." 26 Am. Jur. 2d, § 26, p. 577. We cannot say from the evidence here that Shell delegated authority to the appellant or authorized the employment of him by virtue of which the money embezzled came into his possession. We must conclude that the appellant was not the agent of Shell. Thus the first requisite of § 129, as stated in *Gordon v. State, supra,* was not met.

However, even if it be assumed, *arguendo,* that the appellant was the agent of Shell, the second requisite of § 129 is that, in such capacity, he received personal property "for or in the name or on account of his master or employer." It cannot be determined from the record whether the money alleged to have been embezzled, assuming that it was received by him, was received for or in the name or on account of Shell. In the testimony of Miles the bank account in which the money alleged to have been embezzled was supposed to have been deposited was referred to by the State as "your account" and the bank statements as "your bank statements" and such references were accepted by the witness without correction or explanation. There was no proof as to the name in which the account was actually carried and no bank statement or deposit slips were offered in evidence, although it appeared that a copy of each deposit slip was sent to the Shell Oil Company New York Data Center. There was an identification number—SI201—for the station, referred to by the State as "your (Miles') Pulaski Highway Station", with the Shell Oil Company in New York. It appeared that the bank provided the bags in which the

money was placed. Asked if the bag has "your name on it", Miles said, "Yes, sir, SI201." Nor can we tell from the record before us to whom the reports which were made out or supposed to be made out by the appellant were directed or in what name the books and records of the station were kept. It seems from the procedure followed as described by Miles that Overload was responsible for any shortage in the deposit and it is as logical to assume that the money representing sales of the station were received by the appellant as an employee of Overload as it would be to assume that it was received by him as an agent of Shell. We cannot say from the evidence before the trial court that it could properly find beyond a reasonable doubt that the money charged in the indictment as embezzled was received by the appellant "for or in the name or on account of" Shell.[3]

The third requisite of § 129, assuming that the appellant was the agent of Shell and received the money in the name or on account of Shell, is that he thereafter fraudulently embezzled it. This requisite involves the question of whether or not the money was appropriated by the appellant by trespass, actual or constructive, that is whether the appellant or Shell had possession of the money at the time of the unlawful appropriation. If Shell had actual or constructive possession of the money at that time, the crime would be larceny. And to make the crime embezzlement the appellant had to be in actual possession of the money at the time he appropriated it; constructive possession in him is not sufficient. *Loker v. State*, 250 Md. 677, 687. In view of our holdings as to the first and second requisites of the statute we need not reach this question nor need we reach the point whether the evidence was sufficient to prove that the appellant in fact

---

3. We note that § 129 contains no specific requirement that ownership of money embezzled be either alleged or proved, the statute only requiring that the money "shall be delivered to or received, or taken into possession by him for or in the name or on account of his master or employer." Allegation of ownership of the money may be supported by proof of any legal interest or special property of the money as in the case of larceny. *Loker v. State*, 250 Md. 677, 683-684.

appropriated the money in any event. We point out, however, that it was not shown directly that the money alleged to have been stolen was actually ever in the possession of the appellant. The usual practice as to what was done or should have been done with the money was described and Miles testified the appellant said he had deposited it. The only proof that the money was not deposited was that Miles said it was not. But there was nothing to show, assuming that the appellant appropriated the money, whether he did so before it was locked in the bank bag or thereafter; whether the bags had been placed in the bank depository,[4] or whether, if they were placed in the bank depository, the appellant had obtained them from the bank; whether only the appellant had authority to obtain them from the bank after they were placed in the bank depository or whether others had such authority; whether there was only one key to each bank bag or whether others had keys and access to them. We recognize, however, that "almost always in the case of embezzlement, the determination of guilt must be inferential." *Martel v. State,* 221 Md. 294, 299.

Applying the test as to the sufficiency of the evidence as stated in *Williams v. State,* 5 Md. App. 450, with respect to the first two requirements of § 129, we hold that the evidence did not show directly nor did it support a rational inference of the facts to be proved, from which the trial court could fairly be convinced, beyond a reasonable doubt, of the appellant's guilt of the offense charged. Thus its judgment on the evidence was clearly erroneous. Md. Rule 1086.

> *Judgment reversed; case remanded for a new trial.*

---

4. Miles said the appellant had told the 3:00 to 11:00 and 11:00 to 7:00 shift attendants not to place the money in the bank depository.