## E. STEPHEN FARLOW *v.* STATE OF MARYLAND

[No. 480, September Term, 1969.]

*Decided May 27, 1970.*

The cause was argued before MURPHY, C.J., and AN-
DERSON, MORTON, ORTH, and THOMPSON, JJ.

*William F. Mosner* for appellant.

516

*Gilbert Rosenthal, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Charles E. Moylan, Jr., State's Attorney for Baltimore City,* and *Barry S. Frame, Assistant State's Attorney for Baltimore City,* on the brief, for appellee.

ORTH, J., delivered the opinion of the Court.

If a person unlawfully appropriates the personal property of another to his own use the path between proof of that fact and conviction of a crime should be straight and clear. But in the absence of a legislative enactment creating an all inclusive crime of theft it is not. We do not have such a statute in Maryland. The result is that the precise factual circumstances determine what offense is committed and one offense is distinguished from another by fine distinctions, always technical and frequently absurd. See *Loker v. State,* 250 Md. 677; *Loker v. State,* 2 Md. App. 1; *Couture v. State,* 7 Md. App. 269; *Gordon v. State,* 5 Md. App. 291; *Lockard v. State,* 3 Md. App. 580; *Van v. State,* 1 Md. App. 347. The prosecutor is faced with a kindle of offenses and if the proof established deviates from the proof anticipated, or if the facts are not precisely interpreted, there may be an acquittal of the offense pursued.[1] This is so because larceny in this jurisdiction is a crime under the common law. Only the punishment authorized on conviction of it, more severe if the value of the goods stolen is $100 or upwards, and its classification as a felony in such case, are prescribed by statute. Code, Art. 27, § 340. And see § 341. See also *Gazaille v. State,* 2 Md. App. 462, 465. Simple common law larceny is the wrongful and fraudulent taking and removal of personal property from the possession of another against his will, with intent to deprive the person

---

1. "What has concerned codifiers of the larceny type offense is that gaps or crevices have separated particular crimes of this general class and guilty men have escaped through the breaches. The books contain a surfeit of cases drawing fine distinctions between slightly different circumstances under which one may obtain wrongful advantages from another's property." *Morissette v. United States,* 342 U. S. 246, 271-273.

entitled thereto of his ownership therein. *Robinson v. State,* 4 Md. App. 515, 532. The "taking" refers to the taking of possession from possession of one entitled thereto. Thus it must be a trespassory taking and trepass against possession is the matrix of the common law larceny concept.[2] There has been a constant judicial struggle to ascertain who has possession because an accused cannot, in legal contemplation, trespass against a person's property, if that person does not have possession. Clark and Marshall, *Law of Crimes,* 6th Ed., § 12.00, p. 707. In general, the taking of possession from another is always a trespass unless with the consent of the other. Consent to possession obtained by fraud, force or intimidation is the same as no consent so far as trespass is concerned. So if the taking is pretended to be for a temporary purpose but with the real intent at the time of the taking to deprive the other of his property permanently, it is a trespassory taking and larceny, sometimes termed "larceny by trick." On the other hand if the taking was with innocent intent and thereafter, as a result of a change of mind there was a wrongful appropriation, it is not larceny because the misdeed was by one having lawful possession. It is because trespass against possession is the matrix of common law larceny that several large gaps in the law result. Although larceny is committed when a person by fraud obtains possession and carries the goods away with intent to appropriate them, it is not larceny if the fraud induced the possessor to part with *title* as well as possession;[3] by obtaining title, even though by fraud, the wrongdoer is not a trespasser by taking and holding goods which, by reason of the title, are his own. This gap was plugged by creating the crime of false pre-

---

2. This is *trespass de bonis asportatis* and has no reference to trespass on or to real estate.

3. An exception was recognized if a false token was employed, i.e., a false weight or measure. Such a case was known as a common law cheat and this was indictable as a misdemeanor. See 2 Bishop, New Criminal Law, c. X (8th Ed. 1892). Common law cheat has been to all intent swallowed by the offense of false pretenses. *Perkins on Criminal Law,* 2nd Ed., p. 296.

tenses. See Code, Art. 27, § 140. If personal property, possession of which was acquired by a servant or employee without trespass, in the name of or on account of his master or employer, is fraudulently appropriated by such servant or employee, it is not larceny. This gap was plugged by creating the crime of embezzlement. See Code, Art. 27, § 129. It has been expanded to apply to other than servants and employees, as for example, presidents and directors of a State chartered bank, § 128; insurance agents, solicitors and brokers, § 131; fiduciaries, § 132; carriers, § 133; and public officials, § 138. If a person who is entrusted with goods for the purpose of applying them for the use and benefit of the owner or person who delivered them, fraudulently converts them to his own use, he is not guilty of larceny (unless within the ambit of larceny by trick). This gap was plugged by creating the crime of larceny after trust. See Code, Art. 27, § 353. And we note that even if there is a temporary taking, if the intent is not to deprive the owner of the goods permanently, the offense is not larceny. This gap was plugged by creating the offense of unauthorized use or larceny of the use of certain property such as livestock and vehicles. See Code, Art. 27, § 349. We make one more observation. "The general rule is that money or property delivered under a mistake of fact can be recovered if the recipient shared the mistake or fraudulently took advantage of it. * * * His duty to return it is clear and his appropriation of it after learning of the mistake is wrongful." *Perkins on Criminal Law*, 2nd Ed., p. 253. But the recipient is not always guilty of larceny in the light of the requirement of trespass, even though he may not be free from fault. The test is: "If the recipient acquires lawful possession before he discovers the mistake [that is at a time later than when the property is offered him], his appropriation to his use is not larceny, however wrongful it may be; if the discovery is made before he acquires lawful possession [that is before he takes what is offered him], it is his duty to disclose the error, and taking by him without such disclo-

sure is a constructive trespass and hence sufficient for larceny." *Id.* at 254.

Generally speaking therefore, within the frame of reference of the taking, it is larceny if the taking is trespassory. If the taking is not trespassory, it is false pretenses when title to the goods as well as possession is obtained by fraud; it is embezzlement if a servant or employee fraudulently converts to his own use goods of his master or employer which are in the possession of the servant or employee; it is larceny after trust if a person entrusted with the possession of goods for the purpose of applying them for the use and benefit of the owner or person who delivered them fraudulently converts them to his own use.

In the case before us it is clear that E. Stephen Farlow (appellant) unlawfully appropriated monies belonging to John D. Schapiro and others, trading as Crown Industrial Park and Warehouse (Crown). Farlow was hired by Crown as its General Manager in June 1967 and fired 18 July 1968. Crown rented space to various manufacturers for the storage of goods. An inventory of the goods of each manufacturer was maintained and goods withdrawn from Crown, as evidenced by a bill of lading, were deducted from the inventory. If goods stored by Crown were damaged by Crown's negligence (damaged goods), it was responsible to the owner. If an owner's inventory showed more goods than were in Crown's possession (shortages), Crown was also responsible. But if Crown had more goods than appeared by the inventory (overages), it was its practice to sell such goods and retain the proceeds without notice to the customer. Damaged goods were also sold, but unlike the overages, Crown was responsible for the value of the damaged goods. It seemed that prior to Farlow's employment damaged goods and overages were sold at auction. When Farlow became General Manager, however, he engaged a George W. Krauss, an independent broker, to dispose of such goods. Samples were given to Krauss and he would show them to his customers who would quote a price. If the price was acceptable the goods

were picked up by the buyer or Krauss. The sales price would be paid directly to Krauss and he would deduct his commission of 15% and deliver the balance to a secretary of Crown or Farlow. No bills of lading were involved. The charges against Farlow arose from this practice. In receipt of information tending to show that Farlow had appropriated to his own use monies and goods belonging to or in the lawful possession of Crown, the prosecuting authorities were faced with the task of determining what crimes had been committed. The problem was avoided temporarily by the return of an indictment charging various offenses arising from the same acts. Indictment 2364 charged larceny after trust by the 1st count— that on 29 July 1968 Farlow feloniously and fraudulently converted to his own use $3930.50 which had been entrusted to his possession by Crown for the purpose of applying the monies for the use and benefit of Crown. It charged embezzlement of the same monies on the same date by the 2nd count. It charged grand larceny of the same monies on the same date by the 3rd count.[4] At the trial before a jury in the Criminal Court of Baltimore, motion for judgment of acquittal was made at the close of all the evidence and denied. In the charge to the jury the court said: "Now with respect to indictment 2364, the State is only pressing the third count of the said indictment, which charges larceny in the sum of three thousand nine hundred and thirty dollars and fifty cents. Therefore, your verdict under this indictment will be either guilty or not guilty under the third count. You need not make any finding as to the other counts." The basis for the court's assertion that the State was pressing only the third count is not disclosed by the record. It may be that the State so stated in its argument to the jury which was

---

4. It seems that two other indictments, 2365 and 2367, were returned against Farlow, charging embezzlement, larceny after the jury only on the embezzlement counts and the jury rendered a trust and larceny of specified goods. These indictments went to verdict of not guilty. Another indictment, 7339, according to the court's remarks to the jury, was "abandoned" by the State because it covered the same "incident" as did 2364.

made prior to the charge. In any event, as to indictment 2364, the verdict of the jury was simply "guilty." The docket entries, however, read as follows: "Guilty 3rd counts [sic]; Not Guilty 1st and 2nd counts." We believe, in the circumstances, that after all the evidence was in, the State met the problem of the nature of the crime committed with respect to the monies designated in indictment 2364 by concluding that it was larceny and was content that the jury be presented only with the question of guilt or innocence of Farlow under indictment 2364 with regard to that offense. We consider that Farlow was acquitted of larceny after trust and embezzlement. The question is whether the evidence adduced was sufficient in law to sustain the conviction of larceny. The question is before us on the denial of the motion for judgment of acquittal and the test to be applied in determining the question is that set out in *Williams v. State*, 5 Md. App. 450.

The monies designated in indictment 2364 were the proceeds of a sale by Krauss to Miller Chemical and Fertilizer Corporation (Miller) of an insecticide known as "Sevin" stored at Crown by Union Carbide Company (Union). It was elicited from Farlow on direct and cross-examination that shortly before his dismissal he had been informed by an employee that there were some broken cartons of agricultural chemicals by one of the buildings. Farlow told Krauss that Raymond Rogowski, the Operations Manager of Crown, would give him "those which were to be picked up when he was ready to do so." Krauss indicated they would bring the same price as others sold by him.[5] Farlow said he had arranged with Krauss for

---

5. Mrs. Mary Jane Linger, who was employed by Crown as secretary to Farlow, testified that originally all insecticides had been stored in building 40 but were moved to building 56. In February 1968 Union Carbide made an inventory of their goods. "It was counted by their people and our people." Only the goods in building 56, which was in cartons, was inventoried, but it appeared that some 200 bags of insecticide had remained in building 40. "Mr. Farlow said he was going to keep them up there and not tell Union Carbide about them." It was proved that 200 bags of insecticide were sold by Krauss to Miller in April 1968 at 35 cents a pound. This was apparently the subject of indictment 2365 of which Farlow was found not guilty.

the sale of approximately 35 cartons of damaged goods. However, Rogowski testified that on 17 July 1968 Farlow told him that 50 or 60 cartons, 5 or 6 full pallets and 2 partial pallets of Union Carbide Insecticide were to be picked up by Krauss. There are about 25 or 30 cartons in a pallet. There was received in evidence a purchase order issued by Miller, addressed to Krauss, "confirming order." It was dated 17 July 1968, requested shipment "Thursday" by Miller's pickup from Crown Terminal. It called for "187 ctns. 50 # Sevin 85%" and "50 Cs. (4/102) Sevin 80%" at 35 cents a pound. There was also received in evidence an invoice No. 01582 on the billhead of Krauss, dated 20 July 1968, billing Miller for "185 cases insecticide—85% 9,250 lb. at 35 cents a lb.—$3237.50" and "50 cases insecticide—80 CW 2,000 lb. at 35 cents a lb.— $700.00" for a total of $3937.50. There was interlineation under the 2000 lb. figure, "20 short", and the figure $700 was changed to $693 and the total to $3930.50. There was also received in evidence a check dated 24 July 1968 drawn by Miller to the order of Krauss in the amount of $3930.50. It referred to invoice 01582 dated 20 July 1968 and to G. Krauss as the vendor. The check was endorsed "George W. Krauss" and a stamp thereon indicated it was cashed on 25 July 1968 by The Union Trust Company of Maryland.

Krauss testified that on 25 July when he received the check for the insecticide he sold to Miller he telephoned Crown and found out that Farlow was not there. He then telephoned Farlow at his home and arrangements were made to meet at the Liberty Road Branch of The Union Trust Company. "I didn't know what to do with it. * * * He gave me the merchandise, and I thought I was to turn the money over to the right people." He cashed the check, took the 15% commission due him and gave the balance in cash to Farlow.

Farlow testified that Krauss telephoned him and said he had the money for the goods. "I said, 'Well, that's fine George, but I'm no longer with the warehouse.' He said, 'I know this, but I have done business with you before.

You wanted it in cash. I want to turn it over to you.' I said, 'Fine.' " Farlow said he then called the comptroller for Crown, Ken Schertle, and told him that Schapiro's letter discharging him had directed him to take up any matters with Schertle. He did not tell Schertle about the money received from Krauss. He said he tried to get together with Schertle on several occasions but they never met. He deposited the monies received from Krauss in his personal checking account on 29 July. On 25 October he wrote Schapiro, enclosing a check in the amount of $575.92, representing the difference between the amount given him by Krauss and the monies he claimed were due him by Crown. At this time he knew he was under "investigation." He claimed that he did not know the quantity of the goods sold by Krauss until he received the proceeds of the sale. Asked what his intention was with regard to the money given him by Krauss, he said, "To make sure I got that which was mine, or be compensated for that which was mine." [5]

There was entered in evidence by way of stipulation that a physical inventory made on 8 October 1968 of the Union Carbide Company goods stored by Crown established that on the basis of inventory records maintained there was a shortage of approximately 185 cartons of Sevin, 85 percent, and 50 cartons of Sevin, 80 percent. This was the same quantity of Sevin sold by Krauss to Miller. Farlow says in his brief, "The only conclusion to be drawn from this is that the insecticide sold was not overage or damaged goods, but that it was taken directly from the Union Carbide inventory stored on Crown's premises."

It may be that this evidence was sufficient in law to sustain a conviction of the larceny by Farlow of the goods sold by Krauss. This is so because on the evidence the trier of fact could find that the goods sold were not dam-

---

5. Farlow apparently deducted the value of personal property which he claimed was his and was in the possession of Crown, and what he thought should be due him for vacation and severance pay and expenses.

aged or overage but came from the inventory of Union lawfully possessed by Crown. There was a trespassory taking by Farlow through Krauss, who physically took the goods but at Farlow's instigation. It is immaterial that at the time Farlow instigated the taking he was an employee of Crown or that at the time of the actual taking he was not an employee; the goods in any event were in the possession of Crown at each of these times and not Farlow. The trier of fact could also find that the taking was with intent on the part of Farlow to permanently deprive Crown of the goods. See *Melia and Shelhorse v. State,* 5 Md. App. 354, 360-361. However, Farlow was not charged with the larceny of the goods.

And it may be that this evidence was sufficient in law to sustain a conviction of larceny after trust of the monies. This is so because on the evidence the trier of fact could find that Krauss entrusted the monies to Farlow for the purpose of having Farlow apply them to the use and benefit of Crown, and that Farlow fraudulently converted them to his own use. On such findings the offense would be a classic example of larceny after trust, but Farlow was placed on trial on that charge and acquitted. He is forever free from further prosecution for its commission.[6]

Although Farlow may have been guilty of the larceny of the goods, (for which he was not charged), and the larceny after trust of the monies, (for which he was acquitted), we do not feel that the evidence was suffiicent in law to sustain the conviction of larceny of the monies. This is so because there was simply no trespassory taking of the monies. If it be considered that Krauss was in lawful possession of the monies as the proceeds of a sale of goods he could legally make, it is clear that he freely gave possession of the monies to Farlow and that Farlow

---

6. We note that on the evidence Farlow was not guilty of embezzlement, either of the goods or the monies. The goods were in the possession of Crown when taken; Farlow may have been in custody but not possession of them. And Farlow was not an employee of Crown when he received the monies.

did not obtain possession by a trespass, actual or constructive. If it be considered that Farlow had no authority to have the goods sold because they were not damaged goods or overage, and that the sale of them was to all intent and purpose by Farlow acting through Krauss, then the possession of the proceeds of the sale by Krauss was possession by Farlow and there could be no trespassory taking of monies in his own possession even though that possession was constructive. In short, Farlow may have stolen the goods and violated a trust as to the money but in no event was his conversion of the money to his own use common law larceny.

> *Judgment reversed; costs to be paid by the Mayor and City Council of Baltimore.*