332 A.2d 421.

STATE *vs.* GRACE C. CRESCENZO.

FEBRUARY 3, 1975.

PRESENT: Roberts, C. J., Paolino, Joslin, Kelleher and Doris, JJ.

KELLEHER, J. In November 1968, the Providence County Grand Jury returned an indictment that charged the defendant with embezzling, during an 18-month period, $35,000 of funds belonging to her employer, a Providence law firm. Four years later, in December 1972, a Superior Court jury, after listening to some 8 days of testimony, returned a guilty verdict. Subsequently, the trial justice denied the defendant's motion for a new trial and imposed a 2-year sentence which was to be served at the Women's Reformatory. Before us she has, through her appellate counsel, raised a variety of issues, some of which relate to the sufficiency of the indictment, the alleged disappearance and reappearance of a juror, the excuse of an apparently indifferent juror, various evidentiary rulings

and jury instructions given by the trial justice, and his imposition of a 2-year prison sentence on a defendant who had no prior criminal record.

The record before us gives one an intimate view of the operations of an active law firm whose specialty is trial work and for which defendant for many years had performed a number of different duties while she acted as a combination legal secretary, office manager, bookkeeper, and "girl Friday." It can be said without fear of contradiction that when the attorneys were engaged in court, defendant kept things moving in the office. One of the firm's partners who testified told the jury that defendant "handled the finances" and "paid the bills." A power of attorney that was on file with the state's largest bank gave defendant full authority to draw and issue checks, to endorse, and to cash or deposit checks which were made payable to the firm. The firm, which prior to and during the time referred to in the indictment was located in a downtown office building in Providence that also housed the main offices of the bank, maintained at this bank two checking accounts which for the purposes of this opinion we will refer to as a "partnership account" and a "clients' account."

The office routine required that all incoming checks be routed to defendant's desk. The checks were of two categories. Some checks were made payable to the joint order of the client and the firm while other checks were made payable to the sole order of the firm. Before proceeding further, we should point out that relevant papers of any new case coming to the firm were placed in a manila file and the file given a number. Various office disbursements, such as filing or sheriffs' fees, were to be noted on the interior side of the file. When a joint order check in payment of a claim or in satisfaction of a judgment was received, defendant placed it in the clients' account check-

book. She would consult with the attorney who had handled the case. He would set the fee. The defendant was then able to draw the various authorized disbursements from the check. Some of the disbursements would relate to bills owed by the client for medical services rendered in his behalf. The client would be summoned to the office so that he could endorse the check. Once endorsed, the check was then ready for deposit in the clients' account.

Checks payable to the firm when received were placed in the partnership account checkbook. A so-called bill file was maintained where duplicates of the bills rendered clients were placed; when payment of the bill was made, the duplicate bill was receipted and attached to the file. The file was then closed.

Periodically, defendant would take the checks from the two books, endorse them in her representative capacity, and go downstairs to the bank where she made a deposit. She maintained a duplicate deposit slip system for each account. For each deposit she filled out two identical slips. On the front side of each slip she would list the date, the amount of cash deposited, the total amount of the checks being deposited, and the total amount of the deposit. On the reverse side of each slip she would list the amount of each check being deposited and the federal reserve number of the bank upon which the check was drawn. The teller would receipt both slips and return one of the slips to defendant. This slip served as the firm's record for the deposit.

It was uncontradicted that defendant's job was to deduct from the check bearing a client's name any fees and expenses due the firm by first drawing a check on the clients' account in the requisite amount to the firm, then endorsing it, and finally depositing the client account check in the partnership account. Checks made payable solely to the firm were to be endorsed by defendant and

were to be deposited in the partnership account. There was testimony that as a general rule defendant was not to cash any incoming checks that might be destined for either account. There were infrequent occasions when a client account check made payable to a client representing his net share of a settlement or a judgment would be cashed by defendant in the downstairs bank and the proceeds returned to the office and given to the waiting client. However, clients' account checks which were drawn to the order of the law firm were to be endorsed and then deposited in the partnership account. They were not to be cashed. When writing a check drawn on the clients' account, defendant would note on the checkbook stub the file number, the date of the deposit, and the amount of deposit that served as the source of the funds for the check.

The senior partner testified that the partnership account served as a source to pay all the office expenses including salaries due attorneys who worked for the firm as associate counsel, wages owed a clerical staff that consisted of as many as eight individuals, and the partners' profit. Each partner took a weekly or biweekly draw and at various times during the year, the partners would examine the partnership account and take from the outstanding balance their respective share of what they believed to be the profit, making sure to leave a balance in the account.

In late December 1967 or early January 1968, the partners first became concerned about their financial condition. A look at the balance in the partnership's checking account indicated that the year-end profit seemed a most inadequate result of a 12-month period filled with arduous efforts and a great deal of success. The partners also began to receive complaints from the firm's creditors about their bills not having been paid. In sensing that

something had gone wrong, the partners first thought that the bookkeeping system was at fault.

They asked defendant to produce the checkbooks for each account. The defendant had made a practice of taking these records home to bring them up-to-date. The partnership account checkbook was produced within a few days, but the clients' account checkbook was not made available until some 5 weeks after the partners' initial request. The defendant attributed the delay in producing the clients' checkbook to a variety of reasons which the partners first felt were plausible, but as events unfolded, their implicit faith in defendant's integrity and ability began to dissipate as they came to realize that the trouble was not with the system but with the bookkeeper. Time marched on and finally the partners reached the point where, after making numerous efforts to piece together a true picture of their fiscal affairs, they felt the necessity of taking appropriate action. The defendant's power of attorney was revoked on Friday, March 29, 1968 and on April 1, 1968, her services with the firm were terminated. The partners then hired an accounting firm to review their records and present a report. An extensive audit was made. The audit report triggered an investigation by the detective division of the Providence Police Department. The embezzlement indictment followed.

The defendant's attack on the indictment apparently came by way of a motion to quash. We say "apparently" because we have no transcript of the pretrial hearing which was held in May 1967. The motion sought dismissal on the grounds of the vagueness of the indictment. The defendant complained that the indictment was so inartistically drawn that her federal fourteenth amendment rights to due process and her state constitutional right, art. I, §10, to "be informed of the nature and cause of the accusation" were violated.

This facet of defendant's appeal serves to remind us that the crime of embezzlement was unknown at common law. It is purely a creature of statute. Under most state statutes, an appropriation of money or the property of another, entrusted to the care of the accused, to his own use or to the use of any other person with a fraudulent intent is embezzlement. 3 Underhill, *Criminal Evidence* §576 at 1418 (5th ed. 1957). The defendant is charged with violating the following pertinent portions of G. L. 1956 (1969 Reenactment) §11-41-3:

> "Every officer, agent, clerk, servant or other person to whom any money or other property shall be entrusted for any specific purpose * * * who shall embezzle or fraudulently convert to his own use * * * any money or other property which shall have come into his possession or shall be under his care or charge by virtue of such employment * * * shall be deemed guilty of larceny."

Most, if not all, of defendant's vagueness contentions are specifically negated by the court in *State* v. *Davis,* 39 R. I. 276, 97 A. 818 (1916), where it was observed that one's constitutional right to be notified of the nature and cause of criminal accusation made against him does not require an indictment to be drawn with the precision exacted by the common law. Here, the indictment tells defendant that on different dates during an 18-month period immediately preceding April 30, 1968, she had appropriated to her own use $35,000 of her employer's funds and that this money had come into her possession because of her status as an employee. In our judgment the indictment set forth the essential elements of the offense described in the statute and left her in no doubt about the crime with which she was charged. The defense, on the day it filed its motion to quash, sought a bill of particulars seeking the various dates the diversion of funds took place, a description of the currency embezzled, and information

of "* * * how the * * * drafts, checks and cash money, if any, came into the possession of the defendant and for what purposes." A hearing was held on the motion for the bill and decision reserved pending the filing of memoranda by both the prosecution and the defense. We see no evidence that the memoranda were filed or that any other action was taken to obtain the desired information. We believe that if the obtaining of the bill 'of particulars was a matter of crucial concern, this question should have been resolved at the trial level.

The defendant in stressing the ambiguity of the indictment also contends that proof adduced at trial clearly shows that the offense, if any, was larceny and not embezzlement. The basic distinction between the two offenses is that in embezzlement the property comes lawfully into the possession of the offender while in larceny the offender, instead of initially having lawful possession of the property, takes it unlawfully in the first instance thereby committing a trespass against the other's possession. 2 Wharton, *Criminal Law & Procedure* §508 at 182 (Anderson ed. 1957). The defendant in adopting the larceny viewpoint cites a series of cases which espouse the view that if a defendant had the intent to convert prior to his receiving the property, the offense is larceny, and if the intent is entertained subsequent to the receipt of the property, the crime is embezzlement. *See State* v. *Vars,* 154 Conn. 255, 224 A.2d 744 (1966); *Couture* v. *State,* 7 Md.App. 269, 255 A.2d 84 (1969).

The defendant's larcenous view of the record fails to take into consideration Rhode Island's statute on embezzlement and the view expressed by this court some 90 years ago in *State* v. *Taberner,* 14 R. I. 272 (1883). There, it was pointed out that it matters little in this jurisdiction when an employee decides to convert the money or goods entrusted to him by his employer. While it might be

larceny at common law, it's embezzlement under the statute. If the property comes into the employee's possession by virtue of his employment, his conduct comes within the ambit of §11-41-3. *See also State* v. *McAvoy,* 40 R. I. 437, 101 A. 109 (1917).

In attempting to sustain her charge relative to a denial of her right to a speedy trial, defendant places great emphasis on the 4-year hiatus between the return of the indictment and the commencement of trial. This issue was raised in a motion to dismiss which was filed in June 1972. The major thrust of the motion was the state's alleged failure to produce tangible evidence. However, at the conclusion of the motion, defendant suggested as an alternate ground for relief an alleged violation of her right to a speedy trial. There is nothing in this record that would indicate that this motion was ever pressed or considered in the Superior Court. It does appear that sometime before trial the defense counsel and an accountant inspected the available pertinent fiscal records of the law firm. At the appellate level, as defendant draws a bead on the speedy trial issue, we are met with charges and countercharges as to the reasons for the delay and the prejudice caused defendant. None of these allegations were considered in an evidentiary hearing below. We cannot, because of the inadequacy of the record, give the speedy trial issue the thoughtful consideration it might deserve, but leave defendant to pursue this matter by way of our recently enacted postconviction relief statute. Public Laws 1974, ch. 220.

We come now to defendant's evidentiary contentions. She first maintains that the trial justice erred when he refused to consider an offer of proof made by her counsel during his cross-examination of a witness. Here, the transcript presents a different view of what actually occurred. It shows that, while the trial justice expressed some

doubt[1] as to whether such an offer was proper during cross-examination, he allowed the offer to be made but rejected it on the grounds of its relevancy. We find no error in his rejection. The scope of cross-examination is within the discretion of the trial justice. We cannot fault the trial justice for the action taken here. *State* v. *Carraturo*, 112 R. I. 179, 308 A.2d 828 (1973); *State* v. *Jamgochian*, 109 R. I. 46, 280 A.2d 320 (1971).

The trial justice's discretion was invoked during the prosecution's cross-examination of defendant. There was evidence which indicated that there were times when the deposit information placed by defendant on the stub portion of the clients' account checkbook was at odds with the information she had placed on certain deposit slips presented to the bank. She was asked if she could explain the reason for the variance. The defense objected on the basis that the question was outside the scope of the direct examination. Since the basic purpose of cross-examination is the impeachment of the witness, there can be no fixed limit as to the scope of proper cross-examination and much must be left to the judicial discretion of the trial justice. Here, on direct examination the jury had been informed as to the office procedure, and we think it was proper to ask defendant the reason for the discrepancy. We see no error in allowing the question.

It is obvious from a cursory examination of the exhibits that once defendant left the partnership's employ, a great mass of documents was assembled so that an accurate analysis could be made of what had transpired. The docu-

---

[1]The trial justice referred to *Calci* v. *Brown*, 95 R. I. 216, 186 A.2d 234 (1962), where the court ruled that ordinarily offers of proof during cross-examination were not required. However, both the Superior Court's Rules of Civil and Criminal Procedure permit an attorney to make an offer of proof in any instance where an objection to his question is sustained. Super. R. Civ. P. Rule 43(c); Super. R. Crim. P. Rule 26(b).

ments consisted of checkbooks, canceled checks, bank statements, and deposit slips. The audit to which we have previously referred covered the period from November 1, 1966 to March 31, 1968.

At the trial, the accountant identified a series of photostats as copies of canceled checks that had been drawn on the clients' account and made payable to the firm. The checks were drawn, endorsed, and *cashed* by defendant. The accountant testified that the total value of the checks exceeded $39,000. These checks comprised Exhibits 7, 8, and 20. The defendant now maintains that the use of Exhibit 8 as a full exhibit was a flagrant violation of the best evidence rule. She alleges that there was a lack of satisfactory proof as to the unavailability of the original checks.. During the time the present indictment has been pending, the law firm moved its offices from one building to another. One of the senior partners told of his search for the original checks and the unsuccessful efforts made by two of the firm's clerical staff to locate the checks. However, we will not pursue the matter of the missing original canceled checks because of what occurred at trial. The record shows that near the conclusion of the state's case, the prosecutor attempted to introduce as full exhibits a series of documents. When he moved to make Exhibit 8 a full exhibit, defendant's trial counsel stated that he had no objection to its introduction. There being no objection to the ruling as to the evidentiary status of Exhibit 8, there is nothing for us to review. *State* v. *Dettore,* 104 R. I. 535, 247 A.2d 87 (1968)..

Sometime just prior to the conclusion of the defense's testimony, a request was made for the production of the grand jury minutes. It was denied. The defendant now challenges this "summary denial."

We have said that a defendant may examine the minutes of the grand jury's proceedings once he has shown a par-

ticularized need for their production. *State* v. *Lerner,* 112 R. I. 62, 308 A.2d 324 (1973); *State* v. *Ouimette,* 110 R. I. 747, 298 A.2d 124 (1972). We have also stressed the fact that the requisite need must be established at the trial level. A defendant cannot make the motion and then do nothing but hope for lightning to strike. *State* v. *Palmigiano,* 112 R. I. 348, 309 A.2d 855 (1973). He must show some extraneous circumstances which would justify a belief that in-court testimony might be questioned if compared with the testimony adduced before the grand jury. Here, defendant's efforts were nil. The trial justice's denial was a proper response to her bald, unsubstantiated request.

The jury selection process in this case was governed by Super. R. Crim. P. 24(c). This provision permits the selection of 16 potential jurors who hear the evidence, arguments, and charge. At the conclusion of the charge, 12 of the 16 jurors are chosen and go to the juryroom to deliberate. *See State* v. *Spivey,* 114 R. I. 43, 328 A.2d 414 (1974). At oral argument, we were told that the transcript would indicate a strong possibility that one of the 16 who had been absent from a portion of the trial had returned and joined his colleagues in determining defendant's guilt. The record demonstrates that such an intriguing event never occurred.

The individual in question was a Mr. Carreiro. The transcript indicates that when court was convened for the third day of trial, the trial justice remarked, "I have no idea where Mr. Carreira [sic] is, but we're going to proceed and when we come back * * *." The defense argues that the record does not indicate any further information about what fate befell Mr. Carreiro and claims that it is conceivable that he somehow returned to the jury box and subsequently made it into the juryroom. The clerk's minute book lists Mr. Carreiro as one of the

16 jurors but contains no further information as to his participation, or lack thereof, in the case. However, the transcript shows that after the usual mid-morning recess, the trial justice informed the panel that Mr. Carreiro would be absent for the rest of the week, and "* * * of course, he could no longer sit here anyway because I ruled him out when we started * * *."

Having solved the mystery of the disappearing venireman, we come now to the disqualification of a potential juror whose conduct caused the trial justice to believe that the panel member's hearing was impaired.

Near the close of the evidence, the trial justice summoned counsel to his chambers and expressed his concern about one of the potential jurors, a "Mr. B," who, he said, "* * * has a tendency to close his eyes and maybe wander a little bit." The trial justice also said that rather than embarrass the gentleman in question, he would, at that point in the trial when the actual selection of the jury was to occur, tell the clerk not to place "Mr. B's" name in the barrel. The 12 were selected and "Mr. B" left the courtroom thoroughly convinced that the luck of the draw had gone against him.

Before us, defendant now argues that this ex parte discharge was made without her consent and amounted to a complete disregard of her right to have the ultimate 12 selected from the 15 who heard the entire case. Here again, the record paints a completely different picture of what actually occurred. The trial justice asked defendant's trial counsel if they had discussed the question of the panel member with their client. He was told that she had consented to the exclusion of his name from those that might be chosen to deliberate.

In taking the position that the trial justice erred in denying her motion for a judgment of acquittal, defendant places great reliance on the rule which, in the absence of

any direct evidence of guilt, requires a guilty finding only if the facts and circumstances presented not only are consistent with the hypothesis that defendant is guilty but at the same time are inconsistent with any reasonable hypothesis that he is innocent. *State* v. *Fortes,* 110 R. I. 406, 293 A.2d 506 (1973); *State* v. *Franklin,* 103 R. I. 715, 241 A.2d 219 (1968); *State* v. *Montella,* 88 R. I. 469, 149 A.2d 919 (1959). We will not quarrel with the rule. The problem is with its application.

In considering a motion for a judgment of acquittal, a trial justice must give full credibility to the state's evidence, viewing it in the light most favorable to the state, and draw therefrom every reasonable inference consistent with guilt. Neither the credibility of the witnesses nor the weight of the evidence is before the court. *State* v. *Murphy,* 113 R. I. 565, 323 A.2d 561 (1974); *State* v. *Moretti,* 113 R. I. 213, 319 A.2d 342 (1974); *State* v. *Riffkin,* 112 R. I. 308, 309 A.2d 15 (1973).

One senior partner told the jury that although defendant could endorse checks that were to be deposited in either one of the firm's two checking accounts, she could not cash them. He told of the trust-fund status of the money in the clients' account because portions thereof were due either clients or the clients' creditors. The accountant reported that during the period of November 1, 1966 to March 31, 1968, the sum of $339,482 was deposited in the clients' account and that after a comparison of receipts and expenditures, bank statements, canceled checks, deposit slips, and information set out on the stubs, he found a shortage in the clients' account of $21,826. He also discovered that certain checks drawn on the clients' account and payable to the firm were not included in the recorded deposits of the partnership account. The total of these checks amounted to $39,524. These checks had been cashed by defendant.

One of the members of the firm recounted how defendant appeared at the law office on Monday, April 1, 1968, her last day on the job. He stated that at that time he asked defendant if she was in some kind of difficulty and why she took the money. Her reply, he said, was, "What I need is a bullet." There was also testimony that when defendant was asked how much money she had taken, she answered, "I'll have to sit down and figure it out." During the time in question, defendant borrowed approximately $21,000. Over $16,000 was supplied by a cousin of one of the partners. The balance came from a fellow employee. Her fellow employee testified that defendant told her of her "dire need" for money which would be used to purchase machinery for some data processing business with which she was involved. One of the partners told how defendant never took a vacation during the time laid out in the indictment.

The defendant asks that we view *all* the evidence presented at trial. In making this point, she misconceives the entire thrust of the motion for a judgment of acquittal. Its sole target is the sufficiency of the evidence adduced by the state. *State* v. *Lisi*, 105 R. I. 516, 253 A.2d 239 (1969). We measure only the sufficiency of the evidence relied upon by the state as warranting submission of the case to the jury. *State* v. *Main*, 94 R. I. 338, 180 A.2d 814 (1962).

Having in mind the principles just expressed, we look at the evidence that the state claims points to defendant's criminal involvement. The partners who testified made it quite clear that the overwhelming bulk of the many, many checks that were cashed by defendant represented a direct disobedience of the office rule that no checks were to be cashed. The defendant did not deny cashing the checks presented by the prosecution but she maintained that she delivered their proceeds to one of the senior

partners. This particular partner returned to the stand as a rebuttal witness and categorically denied that he either authorized their cashing or received any of the missing funds. Viewing the evidence as we must on a motion for a judgment of acquittal, the state has produced credible evidence which would justify a guilty finding. Once the motion for judgment of acquittal was denied, it was for the jury to decide who received the $35,000 referred to in the indictment. The jury believed the partner. The trial justice in denying the motion for a new trial specifically approved the jury's verdict.

The defendant also complains that the charge to the jury was defective in several ways. However, at trial, defense counsel expressly stated that he had no objection to the jury charge given by the trial court. Ru'e 30 of the Super. R. Crim. P. specifically bars a party from assigning as error any portion of the charge or omission therefrom unless he specifically directs the trial justice's attention to the matter to which he objects and gives the ground for his objection. *State* v. *Murphy, supra.*

The defendant has charged that remarks made by the trial justice indicated that he was incapable of giving her an impartial trial. In support of this assertion, she complains of his "unsympathetic" attitude to the objections raised by her trial counsel, the "cryptic" remarks he made as he ruled on those objections, and his "frequently unorthodox" conduct during the trial. She identifies the unorthodox conduct as the incidents involving the two veniremen, Mr. Carriero and "Mr. B." She does not delineate the "cryptic" remarks or elucidate on his "unsympathetic" attitude but places great emphasis on certain language used by the trial justice when he denied the motion for a new trial.

The denial came in a bench decision; the motion was heard in January 1973, one month after the jury had re-

turned its verdict. In rejecting defendant's version of what happened to the proceeds of the clients' account checks she had cashed, the trial justice observed, "It's too bad, in a way, that she testified as she did because she was smearing the hand that fed her—a real smear—trying to make, I suppose, a last minute attempt to bail out, so to speak, to get out of trouble." The new trial hearing was concluded and the case was continued for sentencing. The defendant returned to the Superior Court in March 1973.

As the sentencing hearing began, defense counsel informed the trial justice that he wished to record his objection to. the trial justice's earlier characterization of his client's testimony as a smear because, counsel said, "I feel that was a prejudicial remark at that particular time, before sentence was imposed." The trial justice then stated, "I am going to repeat it or something similar today, I think, unless counsel persuades me that a lot of thinking I have done about this case isn't correct. But, anyway, we are ready now for sentence." The hearing continued and at no time did defendant move for a mistrial or that the trial justice disqualify himself. Such a motion is the customary way of raising the issue of a trial justice's ability to be fair and impartial. However, we will, since an objection is in the record, consider this facet of defendant's appeal.

The defendant in alluding to the trial justice's remarks about her smear tactics places great reliance on *State* v. *Nunes*, 99 R. I. 1, 205 A.2d 24 (1964). There, the defendant had been convicted of an assault with intent to rape. Earlier, he had been acquitted in another case where he had been charged with rape. After the conviction, but before the defendant filed a motion seeking a new trial, the prosecution asked the trial justice to revoke the de-

fendant's bail. As the trial justice revoked bail, he made the following comment:

> "The evidence is clear before me and the jury has accepted as true he entered four or five homes in East Providence. I am fully aware of the fact that by some miscarriage of justice he was found not guilty of a charge of rape on the same day * * *."

The "miscarriage" to which the trial justice alluded was Nunes' prior acquittal on the rape charge. Nunes' counsel, upon hearing this remark, asked the trial justice to disqualify himself. This request was denied. On appeal, a majority of the court concluded that the trial justice's observation indicated a prejudicial state of mind that must have existed during the course of the assault trial. There is a difference between *Nunes* and the case presently before us.

Here, the trial justice's reference to defendant's alleged smear was made as he was deciding a motion for a new trial. At that point in time a trial justice is bound under our law to weigh the evidence and assess the credibility of the witnesses. The remarks made by the trial justice were based solely on the facts adduced at trial. He had listened to defendant and the senior partner, observed their demeanor and based his opinion as to who was telling the truth on what he had seen and heard in the courtroom during the time of the actual trial.

An assertion that a trial justice is prejudicial to a litigant is a serious charge, and the one making it should be prepared to establish its presence. *State* v. *Buckley,* 104 R. I. 317, 244 A.2d 254 (1968). The defendant has not come close to discharging this burden. While in *Nunes* it was said that if bias on the part of the trial justice exists, its origin is immaterial so long as its existence is "clearly shown." The federal courts in construing a statute [28 U.S.C.A. §144 (1968)] which sets forth a procedure where-

by a litigant can have a judge disqualified on the grounds of "personal bias or prejudice" have ruled that the prejudice contemplated by the statute must arise from an extrajudicial source and not from something learned by the judge from his participation in the case. *United States* v. *Grinnell Corp.,* 384 U. S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966); *Berger* v. *United States,* 255 U. S. 22, 41 S.Ct. 230, 65 L.Ed. 481 (1921). A distinction is to be drawn between a judicial determination derived from the evidence and lengthy proceedings before the court, and a determination not founded upon facts brought forth in the court but based on attitudes and conceptions that have their origins in sources beyond the four corners of the courtroom. *Tynan* v. *United States,* 376 F.2d 761 (D.C. Cir. 1967). The courts have held that an adverse decision in which the reasoning is expressed in a somewhat colorful or caustic language does not constitute bias or prejudice. The basis for this principle is the belief that "* * * a party [should] be discouraged from attacking a judge during the progress of a suit and thereby obtaining his own deliverance from a trial that is not going well or from a judge who is not sufficiently favorable to him." *In re Union Leader Corp.,* 292 F.2d 381, 389 n.14 (1st Cir. 1961).

While we will not preclude a finding of prejudice that is based solely upon completely extraneous and prejudicial remarks made in the courtroom rather than on a street corner, the party who relies on such incidents carries a substantial burden. It is the nature of the judicial process for a judge who hears a case to form an opinion as to merit of the controversy which often requires an assessment of the conduct of the litigants. Prejudice is not established because he has made his observations in language not used by the diplomatic corps.

If it were, disqualification would be a matter of routine rather than the unique situation that it should be.

Here, the trial justice's observation as to defendant was based on the testimony presented in his courtroom. Once he had exercised a preference for the testimony of the partner rather than that of defendant, the language he used to describe defendant's testimony was apropos in light of his view of the record. We see no evidence whatever of any prejudicial attitude of the trial justice toward defendant.

The remaining portion of this appeal concerns the 2-year sentence imposed on defendant. She first points out that there is nothing in the record that indicates that the trial justice was supplied with a presentence report before he sentenced her, and refers us to G. L. 1956, §12-19-6, as amended by P. L. 1961, ch. 190, §1 and Super. R. Crim. P. 32. However, in *Powers* v. *Langlois,* 90 R. I. 45, 153 A.2d 535 (1959), the record was as silent as it is here, but the court ruled that it would assume in the absence of proof to the contrary that the sentencing judge proceeded in accordance with the law. The defendant in the pending case produced no evidence that would overcome the presumption of regularity which attaches to the sentencing procedure.

The defendant's final attack on her sentence is more novel. She asks us to review the sentence imposed upon her and to exercise our inherent supervisory power over the Superior Court and modify what she claims is an excessively severe sentence. The defendant in taking this position points out her lack of any criminal record and her post-indictment return as a legal secretary for other attorneys in the Providence area. These factors, she claims, mandated the employment by the trial justice of some nonconfinement type of sentence such as probation, or a deferred, or a suspended sentence.

Since this case was argued, we have decided in *State* v. *Fortes,* 114 R. I. 161, 173, 330 A.2d 404, 412 (1975), that this court has the power to review alleged excessive sentences.

Initially, we would emphasize here what we said in *Fortes.* Our inherent power will be used in the exceptional case and with an extreme reluctance to interfere with the sentencing power of a trial justice. This power will be exercised only when the record unswervingly points to the conclusion that there is no "justification" for the imposition of a sentence that is "grossly disparate from sentences generally imposed for similar offenses."

Before imposing sentence, the trial justice listened to the contents of 12 letters all of which were addressed to him by different attorneys and asked that the trial justice extend leniency to defendant. He then heard remarks of defense counsel and defendant. The trial justice observed that some of the misapplied moneys were trust funds which actually belonged to the partnership's clients and described defendant's defalcations as an "example type of crime." The trial justice also stressed that the sentence would in no way be related to defendant's trial testimony but he did emphasize his efforts to achieve a "balance" in all his dispositions. He alluded to an earlier embezzlement case where a mother had diverted funds amounting to $7,000, and the resulting sentence was a 1-year prison term. The defendant's conduct, he said, was much more serious than the mother's. He rejected the state's recommendation for a 3-year sentence and imposed the 2-year term.

A judge has no more difficult duty nor awesome responsibility than the pronouncement of sentence in a criminal case. The State Trial Judge's Book at 296 (2d ed. 1969). Admittedly, defendant is a first offender and courts are often more lenient with this type of criminal, even to

the point of making some alternative disposition to incarceration, but we cannot say as a rule of law that any prison sentence for a first offender is *per se* excessive. When we look at the nature of the crime here, we are persuaded that this factor outbalances the fact that defendant is not a hardened, habitual criminal. We agree with the trial justice's classification of embezzlement as an "example type of crime." Sentencing decisions invariably involve the weighing of many often conflicting factors, as where the nature of the offense suggests a punishment which is at odds with that suggested by the type of offender. But we cannot say that deterrence is any less valid a consideration in sentencing than is the rehabilitation of a particular defendant.[2]

The trial justice further noted that his sentence was based in part on the fact that this theft involved a very substantial sum of money. We can find nothing improper in his taking this into account in the consideration of the seriousness of the punishment. Although in modern times our society has moved away from the belief that the major purpose of a sentence is punishment, it is still permissible to weigh this factor in considering the kind of sentence to be imposed.

In particular, we note that our Legislature has seen fit to recognize certain classes of theft as warranting more punishment than others. The amount of money involved in embezzlement determines whether the crime has a maximum of 1 or 5 years imprisonment—1 year for any

---

[2]The ABA Project on Standards for Criminal Justice, *Standards Relating to Sentencing Alternatives & Procedures* (Approved draft, 1968) articulates a strong policy against confinement. Yet even they recognize a specific exception in situations where "[i]t would unduly depreciate the seriousness of the offense to impose sentence other than total confinement." 2.5(c)(iii). The commentary goes on to explain that certain crimes require prison terms in order to discourage similar attempts in the future. Embezzlement from a bank is specifically cited as this kind of crime.

amount up to $500, and a maximum of 5 years for any amount over $500. The Legislature has singled out certain thefts from trust accounts as warranting a maximum punishment 4 times the maximum allowed for other kinds of embezzlement. General Laws 1956 (1969 Reenactment) §11-41-11 provides a maximum of 20 years for embezzlement by bank employees. This statute has no direct application here, but it affords support for society's view of certain kinds of theft as demanding more punishment, and consequently contains an accompanying higher deterrent factor.

Thus, we can ascertain no basis for finding this sentence excessive, the grounds articulated by the sentencing judge show that he considered all the relevant factors, and we find no basis for disturbing the sentence imposed here. In *Fortes* we held that a "manifestly excessive" sentence was subject to revision. We would point out here, as we did in *Fortes*, that attempts at revision should begin in the Superior Court by way of the provisions of Super. R. Crim. P. 35. Those taking that route are reminded that they have the burden of establishing here, on the appellate level, the complete absence of any justification for the sentence imposed in the trial court. The record presently before us is devoid of any evidence that would support such a conclusion.

The defendant's appeal is denied and dismissed.

Petition to reargue denied.

*Richard J. Israel*, Attorney General, *Donald P. Ryan*, Asst. Attorney General, *R. Raymond Greco*, Special Asst. Attorney General, for plaintiff.

*Nugent & Nugent, J. Joseph Nugent, Jr.*, for defendant.