532 A.2d 1357

**Anthony Andrew RICE**

v.

**STATE of Maryland.**

**No. 23, Sept. Term, 1987.**

Court of Appeals of Maryland.

Nov. 5, 1987.

W. Gary Kohlman (Kohlman & Fitch, on the brief), Washington, D.C., for appellant.

Gary E. Bair, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on the brief), Baltimore, for appellee.

Argued before MURPHY, C.J., and COLE, RODOWSKY, McAULIFFE, ADKINS and BLACKWELL, JJ.

MURPHY, Chief Judge.

Maryland's consolidated theft statute, Maryland Code (1957, 1982 Repl.Vol., 1986 Cum.Supp.) Article 27, §§ 340–344, enumerates in five subsections of § 342 alternate methods by which the crime of theft can be committed.[1] This

---

[1]. Subsections (a) through (e) of § 342 provide:

"(a) *Obtaining or exerting unauthorized control.*—A person commits the offense of theft when he willfully or knowingly obtains control which is unauthorized or exerts control which is unauthorized over property of the owner, and:

(1) Has the purpose of depriving the owner of the property; or

(2) Willfully or knowingly uses, conceals, or abandons the property in such manner as to deprive the owner of the property; or

(3) Uses, conceals, or abandons the property knowing the use, concealment, or abandonment probably will deprive the owner of the property.

(b) *Obtaining control by deception.*—A person commits the offense of theft when he willfully or knowingly uses deception to obtain and does obtain control over property of the owner, and:

(1) Has the purpose of depriving the owner of the property; or

(2) Willfully or knowingly uses, conceals, or abandons the property in such manner as to deprive the owner of the property; or

(3) Uses, conceals, or abandons the property knowing such use, concealment, or abandonment probably will deprive the owner of the property.

(c) *Possession of stolen property.*—(1) A person commits the offense of theft if he possesses stolen personal property knowing that it has been stolen, or believing that it has probably been stolen, and:

(i) Has the purpose of depriving the owner of the property; or

(ii) Willfully or knowingly uses, conceals, or abandons the property in such manner as to deprive the owner of the property; or

(iii) Uses, conceals, or abandons the property knowing such use, concealment, or abandonment probably will deprive the owner of the property.

appeal presents the question whether a defendant, charged with theft, is entitled to a jury instruction that a conviction for this offense could not be obtained unless the jury agreed unanimously on all elements of at least one subsection of the statute. To resolve this question we must address issues both of the proper interpretation of the theft

---

(2) The requisite knowledge may be inferred in the case of a person in the business of buying or selling goods who:

(i) Is found in possession or control of property stolen from two or more persons on separate occasions; or

(ii) During the year preceding the criminal possession charged, has acquired stolen property in a separate transaction; or

(iii) Being a person in the business of buying or selling property of the sort possessed, acquired it for a consideration which he knew was far below its reasonable value.

(3) In any prosecution for theft by possession of stolen property under this section, it is not a defense that:

(i) The person who stole the property has not been convicted, apprehended, or identified; or

(ii) The defendant stole or participated in the stealing of the property; or

(iii) The stealing of the property did not occur in this State.

(4) A person who criminally possesses stolen property and a person who has stolen the property are not accomplices in theft for the purpose of any rule of evidence requiring corroboration of the testimony of an accomplice, unless the person who criminally possesses the property had participated in the stealing.

(d) *Obtaining control of lost, mislaid or mistakenly delivered property.*—A person commits the offense of theft when he obtains control over property of another which he knows to have been lost or mislaid, or to have been delivered under a mistake as to the identity of the recipient or nature or amount of the property if he:

(1) Knows or learns the identity of the owner or knows, or is aware of, or learns of a reasonable method of identifying the owner; and

(2) Fails to take reasonable measures to restore the property to the owner; and

(3) Has the purpose of depriving the owner permanently of the use or benefit of the property either when he obtains the property, or at any later time.

(e) *Obtaining services by deception.*—A person commits the offense of theft when he obtains the services of another which are available only for compensation by:

(1) Deception; or

(2) Knowing that the services are provided without the consent of the person providing them."

statute and of the statute's constitutionality under Articles 5 and 21 of the Maryland Declaration of Rights.[2]

## I

In April 1985, at the conclusion of a jury trial in the Circuit Court for Montgomery County, appellant Anthony Rice was convicted of burglary, two counts of robbery with a dangerous and deadly weapon, two counts of use of a handgun in a crime of violence, and theft of property having a value of more than $300. Rice was subsequently sentenced to imprisonment for eighty years, including fifteen years on the theft count. The charges against him stemmed from a burglary and armed robbery on the night of January 17, 1984, of Harold and Cynthia Resnick at their residence in Montgomery County.

The circumstances attending this crime and Rice's subsequent arrest and conviction are not in dispute. The Montgomery County Police were conducting surveillance in the Resnick neighborhood because numerous armed robberies had recently occurred in the area. On the evening of January 17, the police noticed a white Cadillac parked not far from the Resnick residence. Shortly before 11 p.m. that same night the police observed the Cadillac being operated by two men. The driver was wearing a bulky jacket, had facial hair, and appeared to be a black male. At 11:20 p.m. the Resnicks reported that they had been the victims of an

---

**2.** Article 5 states in relevant part: "That the Inhabitants of Maryland are entitled to the Common Law of England, and the trial by Jury, according to the course of that Law...." It thus provides a possible constitutional basis for the jury unanimity requirement. *See McKay v. State,* 32 Md.App. 451, 461, 362 A.2d 666 (1976), *aff'd,* 280 Md. 558, 375 A.2d 228 (1977).

Article 21 states the jury unanimity guarantee expressly:

"That in all criminal prosecutions, every man hath a right to be informed of the accusation against him; to have a copy of the Indictment, or charge, in due time (if required) to prepare for his defence; to be allowed counsel; to be confronted with the witnesses against him; to have process for his witnesses; to examine the witnesses for and against him on oath; and to a speedy trial by an impartial jury, without whose unanimous consent he ought not to be found guilty."

armed robbery that had begun shortly after 9 p.m. They described the robbers as two black males, armed, wearing ski masks, approximately thirty years old, six feet tall, thin, and with facial hair.

On learning of the robbery, the police traced the ownership of the Cadillac to Annabelle Postell, known to the police as an associate of Rice and his twin brother. Early on January 18 the vehicle was located outside a pool hall in Prince George's County and placed under surveillance. About 6:30 a.m. police observed a black male—described at trial as "six feet tall, beard, long three-quarter length blue winter coat on, like a ski parka type thing, and [he] had a hat on"—come out of the pool hall, open the trunk of the car, remove something from the trunk, and return to the building. At approximately 8 a.m., as the man drove the car from the pool hall, he was arrested by the police. He identified himself as Anthony Rice.

The Cadillac was impounded and searched, pursuant to a warrant. The Resnicks had reported that furs, jewelry, and cash were taken in the robbery. The Cadillac contained two handguns, tools, some jewelry, and several fur coats. The fur coats, jewelry, and a chain worn by Rice when he was arrested were identified by the Resnicks as their property. Many other items taken from the Resnicks, including $1,800 in cash, antiques, and other fur coats and jewelry, were never recovered. Neither of the Resnicks identified appellant as one of the robbers.

On the basis of this evidence the trial judge instructed the jury as follows with respect to the theft count:

"The Maryland Theft Statute indicates that a Defendant may be guilty of violating either Subsection A or Subsection C of the statute or guilty of violating both subsections. . . .

. . . .

"In order for you to find the Defendant guilty, all of you must find that the Defendant violated Subsection A or Subsection C or both. . . .

. . . .

"Now, in order to reach a verdict in this case, each of you must agree upon it. Your verdict must be unanimous and it must be based entirely upon the evidence you have heard and seen in the courtroom and the laws given in these instructions."

Rice appealed his conviction to the Court of Special Appeals, asserting that the trial judge's jury instructions were improper. In an unreported opinion the Court of Special Appeals, relying on *Craddock v. State,* 64 Md.App. 269, 494 A.2d 971, *cert. denied,* 304 Md. 297, 498 A.2d 1184 (1985), rejected this contention. We granted certiorari to consider the significant issue raised in the case.

## II

Appellant contends that the trial judge erred in failing to instruct the jury "that it could convict the defendant of theft only if all twelve jurors agreed unanimously that the defendant had committed all the elements of larceny under subsection (a) [of § 342] or all the elements of possession of stolen property under subsection (c)." This error, appellant asserts, created the possibility that in the jury deliberations leading to his conviction the following occurred: six jurors believed Rice took the property from the Resnicks, and so thought him guilty of violating subsection (a); they did not believe he possessed the Resnick property as stolen property, and thus did not think him guilty of violating subsection (c). The other six jurors believed the opposite: they thought Rice guilty of possessing stolen property but not of taking it himself from the Resnicks.[3] As to each subsection, therefore, half the jurors were unconvinced of Rice's guilt. Yet, the appellant postulates, given no jury instruction requiring unanimity as to all elements of at least one subsection, the jury nonetheless returned a verdict of guilty.

---

**3.** Of course, this hypothetical could use any number less than twelve. The same point would be made if eleven jurors thought Rice guilty only of a subsection (a) offense and one thought him guilty only of a subsection (c) offense.

While the result appellant condemns is theoretically possible, the question remains whether it is permissible. With considerable cogency appellant contends it is not. In support of his position, he points out that consolidated criminal statutes are of two classes. The first defines a single crime and, in enumerating subsection offenses, provides different ways the crime may be committed; the second, though cast in the form of a single statute or section, in enumerating subsection offenses actually states autonomous crimes.[4] According to Rice, to determine in which class the subsections of a particular consolidated statute belong requires a comparison of the statute's subsections with each other. He says that if the subsection offenses are conceptually distinct, then they are autonomous crimes and the right to jury unanimity applies to all essential elements. Rice urges that subsections (a) and (c) of § 342 are conceptually distinct (are separate crimes) because they contain different *actus reus* elements and are basically renovated versions of crimes, namely larceny and receiving stolen property, that have quite different common law origins.

We think appellant's argument requires that we first consider whether, as a matter of statutory construction, the jury unanimity appellant seeks is consonant with the language and purposes of the theft statute. Second, we must canvas the relevant case law in determining, as a matter of constitutional law, the proper scope of jury unanimity with respect to consolidated criminal statutes. And, third, we must apply the applicable law to Maryland's consolidated theft statute.

### III

### Statutory Construction

This is not the first time we have considered whether the legislature intended that Maryland's theft statute be re-

---

**4.** We recognized the distinction between these two classes of statutes in *State v. Boozer*, 304 Md. 98, 110–11, 497 A.2d 1129 (1985).

garded as one crime or several. In *Jones v. State*, 303 Md. 323, 493 A.2d 1062 (1985), we confronted this question directly in rejecting a constitutional challenge to the short form charging document provided by § 342(c) of the theft statute. The appellant in *Jones* asserted that because of the wide diversity of elements which comprise the crime of theft under § 342, a charging document stating merely that the defendant "did steal" specified property of the named victim in violation of the statute failed to provide constitutionally adequate notice of the essential elements of the crime charged. Our decision in that case turned on whether the legislature had made "stealing" property or services of another a single criminal offense. We held that it had.

*Jones* thus focused on an earlier stage of a theft prosecution than that here involved. The predicate of our reasoning in *Jones* was "that Maryland's consolidated theft statute constitutes a single crime; [and] that the subsections of § 342 merely specify different acts or transactions through which theft can be proved...." 303 Md. at 338, 493 A.2d 1062.

Nothing in the language of the theft statute or its legislative history suggests that § 342 encompasses multiple crimes for jury instruction purposes. Indeed, the first sentence of § 341 flatly and unequivocally states: "Conduct designated as theft in this subheading constitutes a single crime...." As set forth in the October 1978 report of the General Assembly's Joint Subcommittee on Theft Related Offenses, the legislative history underlying enactment of the consolidated theft statute clearly posits a single offense. In the introduction to that report the subcommittee quotes with approval the following from *Farlow v. State*, 9 Md. App. 515, 516, 265 A.2d 578 (1970): "If a person unlawfully appropriates the personal property of another to his own use the path between proof of that fact and conviction of a crime should be straight and clear."

It may be true, as appellant has hypothesized, that, in jury deliberations, six jurors may think the defendant

guilty of violating § 342(a) and six guilty of violating § 342(c); but on neither (a) nor (c) do all twelve agree. But that hypothetical has another aspect—all twelve jurors are convinced that the defendant has "unlawfully appropriate[d] the personal property of another to his own use." *Farlow, supra,* 9 Md.App. at 516, 265 A.2d 578. From proof of that fact to conviction of a crime the legislature undertook to make a straight and clear path by means of the consolidated theft statute. It appears to us the requirement of jury unanimity that appellant advocates would place substantial obstacles in that path, in manifest contravention of the intent of the legislature. Even more telling is the commentary in the legislative report that specifically annotates the criminal possession subsection, § 342(c). This commentary states:

"By merging the acts of receiving stolen goods and the acts constituting the actual stealing into a single offense (i.e., theft) some confusion has been eliminated. Under Maryland case law, either of two inferences could arise if a person was found in possession of recently stolen goods. One inference was that the possessor was the thief, and the other inference was that the possessor was the receiver of stolen goods.... In some instances, courts were confounded by the dilemma of which inference to draw. However, now that the act of stealing and the act of receiving constitute a single offense (i.e., theft), the confusion is eliminated." Joint Subcomm. Report at 35.

It is manifest from these statements that the subcommittee was well aware that jurors might draw conflicting inferences from evidence such as that presented at appellant's trial. Recognizing that the jury might form different views about the defendant's course of conduct, the subcommittee's concern was that the jury not be required to choose between the conflicting inferences. No unanimity was to be forced upon them because there was to be no necessity to choose: either inference, whether of larceny or of possessing stolen goods, would lead to the conclusion that the

defendant was guilty of theft. We thus construe Maryland's theft statute to not require the jury unanimity that appellant seeks.

## IV

### Constitutionality

■ The legislature has broad power to define what acts shall constitute criminal offenses. *Greenwald v. State*, 221 Md. 235, 240, 155 A.2d 894 (1959), *appeal dismissed*, 363 U.S. 719, 80 S.Ct. 1596, 4 L.Ed.2d 1521 (1960). Included within this power is the prerogative of designating the crime by such names or titles as the legislature deems appropriate. *See Wimpling v. State*, 171 Md. 362, 370, 189 A. 248 (1937). This power, however, is not without constitutional restraints. *Greenwald, supra*, 221 Md. at 240, 155 A.2d 894; *Glickfield v. State*, 203 Md. 400, 404, 101 A.2d 229 (1953). One such restraint is provided by the jury unanimity guarantees of Articles 5 and 21 of the Declaration of Rights, *supra*, n. 2.

As we noted in *State v. McKay*, 280 Md. 558, 561, 375 A.2d 228 (1977), the origins of the jury unanimity rule are not easily discerned.[5] It is beyond question, however, that

---

5. There is considerable scholarly dissension about the original purposes served by the jury unanimity rule. Some commentators ascribe to the rule the original purpose of compensating for the lack of other rules insuring a fair trial. *See, e.g.,* Haralson, *Unanimous Jury Verdicts in Criminal Cases,* 21 Miss.L.J. 185, 191 (1950); others see in the rule the manifestation of medieval concepts of consent, *see* M. Clarke, *Medieval Representation and Consent,* cited in *Apodaca v. Oregon,* 406 U.S. 404, 407 n. 2, 92 S.Ct. 1628, 1631 n. 2, 32 L.Ed.2d 184 (1972). Yet other theories assert that very early in the development of the jury the unanimity rule ceased to serve any real purpose. *See, e.g.,* P. Devlin, *Trial By Jury* 48 (1956).

A modern view of the purpose of the unanimity rule contends that it "helps effectuate the réasonable doubt standard," *United States v. Gipson,* 553 F.2d 453, 457 n. 7 (5th Cir.1977), which was found to be constitutionally required in all criminal trials, state or federal, in *In re Winship,* 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). *Gipson* was interpreting the federal sixth amendment. By an anomaly of legal reasoning, though the sixth amendment is assumed to require a unanimous verdict in a federal criminal trial, *Andres v. United States,*

the rule was firmly established in the common law many centuries [6] before November 3, 1776, the day when the Maryland Constitutional Convention, in approving our original Declaration of Rights, gave the rule explicit constitutional protection in then Article 19. This guarantee was readopted without change in the Declarations of Rights of Maryland's 1851, 1864, and 1867 Constitutions.[7] Virtually no debate specifically concerning the rule survives from the 1776 or subsequent constitutional conventions.[8]

---

333 U.S. 740, 748, 68 S.Ct. 880, 884, 92 L.Ed. 1055 (1948), and the sixth amendment is applicable to the states through the fourteenth amendment, *Duncan v. Louisiana,* 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968), the sixth amendment does not require jury unanimity in state criminal proceedings, *Apodaca,* 406 U.S. 404, 92 S.Ct. 1628. However, a number of state courts have independently linked the unanimity requirement to the reasonable doubt standard. *See Scarborough v. United States,* 522 A.2d 869, 872 (D.C.1987).

**6.** There is general consensus among scholars that by 1367 jury unanimity in criminal trials was a settled rule. *See* W. Holdsworth, *A History of English Law* 318 (1956); Thayer, *The Jury and its Development, Part II,* 5 Harv.L.Rev. 295, 296–97 (1892).

**7.** Article 19 was redesignated as Article 21 in the 1867 Declaration of Rights.

**8.** On August 17, 1776, Samuel Chase proposed to Maryland's Constitutional Convention "[t]hat a committee be appointed to prepare a declaration and charter of rights." *Proceedings of the Conventions of the Province of Maryland, 1774, 1775, 1776,* at 220 (1836). The committee, selected by ballot, presented a draft declaration of rights to the convention on August 27. *Id.* at 228. The convention postponed consideration of the draft until October 3, at which time a motion to refer the draft to a committee of the whole passed by a vote of 27 to 26. *Id.* at 262–63. From that date until October 31 when the draft declaration, in near final form, was reported out to the convention, we know little of the thoughts of the framers, since records were not kept of the debates within the committee of the whole. The debates that were recorded in the convention between October 31 and November 3, when the Declaration of Rights was finally approved, did not concern the jury unanimity clause. *See generally* J. Haw, *Politics in Revolutionary Maryland 1753–1788,* at 298–300 (1972).

It is notable that the Maryland Declaration of Rights resembled in many respects the Virginia Declaration of Rights approved by the Virginia Convention on June 12, 1776. The Virginia Declaration served as a pattern for the majority of the original thirteen states. *See* B. Schwartz, *The Bill of Rights: A Documentary History* 231–36, 256

■ Although we have not previously addressed the specific question now before us, we have considered other facets of the jury unanimity guarantee. One group of our cases focuses on the defendant's right in criminal cases to poll the jury to assure that its verdict was unanimous. In the early case of *Ford v. State*, 12 Md. 514, 549 (1859), the jury was polled as to whether the defendant was guilty of first or second degree murder. The foreman answered, "Guilty of murder in the first degree," but each of the remaining eleven jurors responded merely "Guilty." *Id.* at 548. We held that on these facts the defendant's right to jury unanimity had been violated:

> " 'The verdict is the *unanimous* decision made by a jury and reported to the court, on the matters lawfully submitted to them in the course of the trial.' *Unanimity* is

---

(1971). The similarity between the Maryland and Virginia Declarations with respect to the jury unanimity clause is particularly close. *See Schwartz, supra,* at 235; Virginia Declaration of Rights, 1776, Section 8. Speaking of the remarkable fact that the Virginia Declaration, drawn up largely by George Mason, was accepted so readily throughout revolutionary America, Schwartz writes:

> "The Declaration could be drawn up by one man and adopted with so few changes because, by 1776, a consensus had developed among Americans on the fundamental rights which the law should protect. In giving specific content to those rights, Mason was more the codifier than the transforming innovator." *Id.* at 232–33.

One faint scintilla exists as to the thoughts of the Maryland framers concerning the jury unanimity clause. In Article 19 of the handwritten first draft of the Declaration (which can be seen at the Hall of Records in Annapolis), the word preceding "consent" has been marked out and the word "unanimous" written above it. This may indicate some dissension concerning unanimity: or it may indicate only a misspelling or other error.

The recorded Debates of the Maryland Constitutional Conventions of 1851, 1864, and 1867 contain no discussion of the jury unanimity clause, though the clause, as part of Article 19 (later 21), was readopted in each convention. Representative of this paucity of discussion is the following which states the entire relevant debate on Article 19 during the 1867 convention:

> "Articles 18, 19, 20, 21 and 22 were read and passed over without amendment."

*Debates of the Maryland Constitutional Convention of 1867,* at 141 (Perlman, compiler, 1923).

indispensable to the sufficiency of the verdict, and this, we have seen, has not been in the case before us." *Id.* at 549 (emphasis in original; quoting from 10 *Bacon's Abridg. Title Verdict* 306). Other cases of this nature are *Williams v. State,* 60 Md. 402 (1883); *Coby v. State,* 225 Md. 293, 170 A.2d 199 (1961); *Smith v. State,* 299 Md. 158, 472 A.2d 988 (1984). In *Givens v. State,* 76 Md. 485, 25 A. 689 (1893), we addressed the related issue of the defendant's right to have the clerk "hearken the verdict." [9]

In *McKay* we delved into the fundamental nature of the right to jury unanimity, and whether the right was waivable. We reasoned that the right was not an imperative requirement, but rather existed for the defendant's benefit; hence, like other fundamental rights, such as those to counsel and to confront witnesses, it can be waived. *Id.* [280 Md.] at 569–70, 375 A.2d 228. We rejected the common law prohibition against waiver, stating that "the conditions justifying the common law rule no longer exist." *Id.* at 567, 375 A.2d 228.

Recently, in *Mills v. State,* 310 Md. 33, 527 A.2d 3 (1987), we had occasion to interpret the meaning of jury unanimity in the context of a constitutional challenge to Maryland's capital punishment statute. At issue, *inter alia,* was whether jury unanimity was required as to the nonexistence of specific mitigating circumstances. This issue raised the broader question of the level of jury deliberation at which unanimity is requisite. Both the majority and the dissent agreed that there must be unanimity as to the verdict, and further that the jury's " 'determination of any *ultimate*

---

**9.** To "hearken the verdict" refers to the following procedure. After the foreman of the jury has announced the verdict, the clerk writes the verdict on the record and addresses the jury in these words: "Hearken to your verdict as the Court hath recorded it. You say that _____ is guilty (or not guilty) of the matter whereof he stands indicted, and so say you all." This assures unanimity and enables the jury to correct the verdict if it has been improperly delivered or recorded. *See Givens,* 76 Md. at 487–88, 25 A. 689.

*issue* essential to the verdict must be unanimous.' " 310 Md. at 60, 84, 527 A.2d 3 (emphasis in original). There was also tentative agreement that " 'where alternative findings of historic facts are advanced in support of a single conclusion the better rule is that the jurors need not agree on any single alternative fact provided they all agree on some alternative fact that leads them to a single conclusion on the ultimate issue.' " *Id.* There was disagreement, however, whether the General Assembly in the capital punishment statute had provided that the existence and the nonexistence of specific mitigating circumstances were to be treated as separate "ultimate issues." Although *Mills* bears more directly on the issues we now confront than any of our other prior cases, in large measure it is inapposite, for *Mills* assumes that it was interpreting a unitary crime. Of course, it is this very question—whether theft is one crime or several—that is here in question.

Cases from other jurisdictions germane to the issue before us differ from one another in many respects, but chiefly with respect to whether they deal with theft statutes or other criminal statutes; whether they enumerate theories or merely announce conclusions; whether, if they enunciate theories, these theories are cast as principles of statutory construction or as constitutional doctrine; and, if they enunciate theories, what these theories postulate. An early authority of considerable influence in shaping the law in this area is *People v. Sullivan*, 173 N.Y. 122, 65 N.E. 989 (1903). In that case the defendant had been indicted for first degree murder. The evidence established an apparent attempted burglary by what the dissent described as "a band of tramps," 65 N.E. at 994, of whom defendant was one, and the killing of a policeman. The case was submitted to the jury with an instruction that it could convict the defendant of the murder of the policeman on either of two theories: premeditated murder or felony murder. When Sullivan challenged his conviction, claiming that the instructions violated his right to a unanimous verdict, the New York Court of Appeals stated:

"There was but a single crime charged in the indictment against the defendant,—that of murder in the first degree; and the only issue to be determined by the jury was whether the defendant had been guilty of that crime.... 'It is not necessary that a jury, in order to find a verdict, should concur in a single view of the transaction disclosed by the evidence. If the conclusion may be justified upon either of two interpretations of the evidence, the verdict cannot be impeached by showing that a part of the jury proceeded upon one interpretation and part upon the other.' "

The *Sullivan* rationale has been applied in a great many cases, chiefly those involving murder, *see, e.g., People v. Chavez,* 37 Cal.2d 656, 234 P.2d 632, 641 (1951); *State v. Wilson,* 220 Kan. 341, 552 P.2d 931, 936 (1976), but also many involving other crimes, *see, e.g., People v. Failla,* 64 Cal.2d 560, 414 P.2d 39, 44, 51 Cal.Rptr. 103 (1966) (burglary); *Wells v. Commonwealth,* 561 S.W.2d 85, 87–88 (Ky. 1978) (first degree assault). In substance it was the *Sullivan* rationale expressed by the Court of Special Appeals in its *Craddock* decision, *supra,* 64 Md.App. 269, 494 A.2d 971, when that court was confronted with the identical question now before us. In *Craddock,* the court stated:

"Generally, jurors are not required to uniformly accept all of the evidence presented in order to arrive at a unanimous verdict. Some jurors unquestionably reject evidence that others accept in determining guilt or innocence. In short, the law requires unanimity only in the verdict, not in the rationale upon which the verdict is based. In the case *sub judice,* the statute sets forth various acts that constitute the crime of theft. As long as jurors unanimously agree that theft in some form was committed, nothing more is required." *Id.* at 278, 494 A.2d 971.

The *Sullivan* rule provides a partial answer to the jury unanimity question but not a complete one since the rule appears to impose virtually no constitutional restraints on a legislature's power to define criminal conduct. That such

restraints rightly exist, however, cannot be doubted. By way of illustration, consider that a legislature created a very comprehensive crime which it named "misconduct," and included within it such disparate acts as striking one's spouse, sedition, and driving an unsafe vehicle. No statutory language or manifestations of legislative intent, however unequivocal, that this "misconduct" was "one crime" could possibly relieve the State from its constitutional obligation to accord a defendant the right to jury unanimity as to each of the separate acts.[10]

■ Courts that have sought to qualify the *Sullivan* rule and thus to impose constitutional limits on the legislature's power to define crimes have generally done so by attempting to articulate the factors that distinguish the concept of a single crime committable in alternative ways from the concept of multiple autonomous crimes. The predicate of this reasoning is that if the crime is single, the *Sullivan* rule applies; if the crimes are multiple, it does not. *See, e.g., State v. James,* 698 P.2d 1161, 1165 (Alaska 1985). We

---

**10.** Statutes less extreme than this illustration but nonetheless unconstitutionally disparate have appeared before other courts and these courts have not hesitated to require jury unanimity as to each statutory alternative. In *State v. Lo Sacco,* 11 Conn.App. 24, 525 A.2d 977 (1987), for example, the defendant was charged with violating a statute that in its subsections enumerated markedly different ways of committing disorderly conduct. The statute at issue in *Lo Sacco* —General Statutes § 53a–182—provided:

" 'Disorderly Conduct: CLASS C MISDEMEANOR. (a) A person is guilty of disorderly conduct when, with intent to cause inconvenience, annoyance or alarm, or recklessly creating a risk thereof, he: (1) Engages in fighting or in violent, tumultuous or threatening behavior; or (2) by offensive or disorderly conduct, annoys or interferes with another person; or (3) makes unreasonable noise; or (4) without lawful authority, disturbs any lawful assembly or meeting of persons; or (5) obstructs vehicular or predestrian traffic; or (6) congregates with other persons in a public place and refuses to comply with a reasonable official request or order to disperse.' " *Id.* 525 A.2d at 979.

The defendant was charged with violating three of these subsections. The Appellate Court of Connecticut held that the jury's unanimous verdict had to rest on one, but only one, of the subsections. 525 A.2d at 982.

think this predicate is well grounded in Article 21 of our Declaration of Rights.

The seminal case expounding a test of conceptual distinctness is *United States v. Gipson*, 553 F.2d 453 (5th Cir.1977), a case on which appellant places great reliance. The statute at issue in *Gipson* was 18 U.S.C. § 2313,[11] which enumerated six prohibited acts concerning the sale or receipt of stolen vehicles. In *Gipson*, the court reasoned that the unanimity rule imposed by the sixth amendment "requires jurors to be in substantial agreement as to just what a defendant did as a step preliminary to determining whether the defendant is guilty of the crime charged." 553 F.2d at 457–58. Applying this principle to the six acts prohibited by § 2313, the court held that because the acts fell into "two distinct conceptual groupings"—receiving, concealing, and storing in one group, bartering, selling, and disposing in the other—there could be no assurance that the jury reached the requisite consensus on defendant's course of conduct unless there was unanimity concerning one or the other of the conceptual groups. Jury unanimity as to violation of § 2313 as a whole, in short, was not constitutionally adequate to support defendant's conviction.

The criteria for conceptual distinctness presented in *Gipson* are not entirely clear. One stated criterion is whether a single act may simultaneously constitute two or more types of prohibited conduct, *id.* at 458; another is whether distinguishing among the prohibited acts would present jurors with characterization problems, *id.* Beyond this *Gipson* provides little guidance. One thing, however, is manifest: the nearly exclusive focus in *Gipson* on *actus reus* components. Largely accepting this narrow focus as the predicate of his argument, the appellant refers us to

---

11. At the time *Gipson* was decided 18 U.S.C. § 2313 provided: "Whoever receives, conceals, stores, barters, sells or disposes of any motor vehicle or aircraft moving as, or which is a part of, or which constitutes interstate or foreign commerce, knowing the same to have been stolen, shall be fined not more than $5,000 or imprisoned not more than five years or both."

many cases he contends support the proposition that if two subsection alternatives proscribe different *actus rei*, they are properly regarded as autonomous crimes. Prominent among these cases are *Scarborough v. United States*, 522 A.2d 869 (D.C.1987) (en banc) and *James, supra*, which, though distinguishing the result in *Gipson*, in large measure approves of its approach. Appellant thus urges that we find § 342(a) and § 342(c) conceptually distinct because these subsections proscribe different *actus rei*.

We reject *Gipson's* narrow focus on *actus rei* for a number of reasons. First, while some cases follow the *Gipson* result of requiring subsection or alternative act unanimity,[12] other courts, including the Fifth Circuit (in which *Gipson* was decided) have upheld convictions even though the jury potentially could have held diverse views as to the defendant's specific conduct.[13] Second, we are mindful that a large number of our criminal statutes proscribe disparate *actus rei*. We find no warrant in Article 21 of the Declaration of Rights for disturbing this body of law.

---

**12.** *See, e.g., Lo Sacco, supra; Jackson v. State*, 92 Wis.2d 1, 284 N.W.2d 685 (1979) (involving Wisconsin's consolidated theft statute).

**13.** *See, e.g., United States v. Schiff*, 801 F.2d 108, 114–15 (2d Cir.1986) (distinguishing *Gipson;* general unanimity charge held sufficient though indictment separately alleged acts of failing to make income tax returns, failing to pay income tax, and concealing and attempting to conceal income); *Lampkins v. Gagnon*, 710 F.2d 374, 377 (7th Cir.), *cert. denied*, 464 U.S. 1050, 104 S.Ct. 729, 79 L.Ed.2d 189 (1984) (distinguishing *Gipson;* jury instructions upheld that allowed conviction if jury found defendant "directly commit[ted] the crime or [was] a party to a conspiracy with another to commit it or advise[d], hire[d], counsel[ed], or otherwise procure[d] another to commit it"); *United States v. Sutherland*, 656 F.2d 1181, 1202 (5th Cir.1981), *cert. denied*, 455 U.S. 949, 102 S.Ct. 1451, 71 L.Ed.2d 663 (1982) (distinguishing *Gipson;* jury need not agree unanimously as to which overt acts of defendants established conspiracy); *Williams v. State*, 720 S.W.2d 236, 238 (Tex.App.1986) (general verdict permitted though indictment in single count alleged separate acts of sexual assault); *State v. Dixon*, 127 Ariz. 554, 622 P.2d 501, 508–09 (1980) (no jury unanimity required as to separate subsections of Arizona's consolidated theft statute); *State v. Arndt*, 87 Wash.2d 374, 553 P.2d 1328 (1976) (no jury unanimity required as to alternative modes of violating statute proscribing fraudulent receipt of public assistance).

Third, and most decisively, more factors than *actus rei* alone must be considered in order to properly resolve the present issue.

■ A more balanced approach, we think, would examine all the elements, not merely the element of conduct, that give a crime its distinctive character. Thus mental state, attendant circumstances, and result must be considered in addition to conduct. If after comparing the statutory alternatives with respect to these basic elements the differences that emerge are substantial, the alternatives may have to be regarded as separate crimes for jury unanimity purposes.

## V

■ In applying these principles to subsections 342(a) and (c) of Maryland's consolidated theft statute, we note at the outset that, though the approach enumerates distinct factors, we must ultimately rely on common sense and intuition to give each of the factors its proper weight. *See United States v. Williams*, 737 F.2d 594, 614 (7th Cir.1984). As we earlier observed, courses of conduct different from and inconsistent with each other may come within the proscriptive ambit of these subsections. Rice could not have both stolen the Resnick property and possessed it as stolen property, a fact which deserves significant weight. We note, however, that the subsections are somewhat unique in the respect that the same evidence of possession will support each of two inconsistent views of the defendant's *actus reus*, that is, it will support inferences of violation of either subsection. *See Richardson v. State*, 398 F.Supp. 425, 433–34 (D.Md.1975).

With respect to mental state, subsection (c) has a scienter requirement absent in subsection (a); however, it is a factor of some importance that the basic mental state—the intent to deprive the owner of the property—is identical in both subsections. This identity of mental state among the traditionally distinct theft offenses has long been recognized.

Another court in a similar context has stressed the importance of this factor. *See United States v. Schiff,* 801 F.2d 108, 115 (2d Cir.1986).

Differences in requisite attendant circumstances often distinguish one crime from another. This element played a major role in the characterization of the traditional acquisitive offenses, as courts were forced to distinguish whether the defendant had possession or custody of the property, for example, or whether the victim parted with title or only possession. These distinctions have largely been eliminated in the new theft statute. Between (a) and (c) one distinction in this element remains: (c) requires proof that the property was in fact stolen property. We think, however, that this does not import a major difference in the present context, since both (a) and (c) share the common feature that the property was wrongfully taken from the owner.

Whatever variance there may be between the elements of (a) and (c), it is clear that violation of either leads to the same result. In either case the defendant has appropriated the property of another person without that person's consent. It is this that imparts to (a) and (c) their wrongful character, and, we think, imparts to them the same wrongful character. We know of no constitutional constraints flowing from the jury unanimity clause that require a focus on the specific mechanics of a wrongful appropriation at the expense of the result of the appropriation. To the contrary, we think this identity of result is properly accorded great weight in resolving the question whether (a) and (c) are one crime.

Having compared the above elements of subsections (a) and (c), we are satisfied that on balance (a) and (c) are not autonomous offenses but rather one crime defined two ways. It follows that the jury unanimity sought by appellant is not constitutionally required.

Accordingly, the trial court's jury instruction was not erroneous in this case.

JUDGMENT AFFIRMED, WITH COSTS.