**SECOND-DEGREE MURDER—INSTRUCTIONS**

- Second-degree murder embraces a killing accompanied by any of three alternative *mentes reae* – an intent to kill but without deliberation and premeditation, an intent to inflict such serious bodily harm that death would be the likely result, or the deliberate perpetration of a knowingly dangerous act with reckless and wanton unconcern and indifference as to whether anyone is harmed.
- Jurors must be instructed that, to warrant a conviction, each juror must find the elements of at least one of those alternatives beyond a reasonable doubt and may not mix the elements of one with the elements of another, but there need not be unanimity on any one of them, so long as all 12 jurors agree that one of them has been proved.

**RULE OF COMPLETENESS**

- Where part of a written or recorded statement is used in cross-examination to show inconsistencies between the statement and the witness's testimony but never actually quoted or introduced into evidence and the opposing party moves to introduce the balance of the statement under Md. Rule 5-106, that party must show that the part sought to be introduced is admissible and suffices to give context to the part used in the cross-examination.
- In this case, that did not happen.

Circuit Court for
Montgomery County
Case No. 00000128132CR

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 2664

September Term, 2016

ADOU KOUADIO

v.

STATE OF MARYLAND

Eyler, Deborah S.,
Kehoe,
Wilner, Alan M. (Senior Judge, Specially
Assigned)

JJ.

Opinion by Wilner, J.

Filed: February 1, 2018

Appellant was convicted by a jury in the Circuit Court for Montgomery County of the second-degree murder of his infant son, Amir, along with three counts of child abuse, for which he was sentenced to 40 years imprisonment. He complains in this appeal that:

(1) the instructions given to the jury on second-degree murder were erroneous;

(2) the evidence was legally insufficient to sustain the convictions;

(3) the court erred in admitting a statement by the child's mother that, when appellant learned that she was pregnant, he wanted her to have an abortion; and

(4) after admitting in evidence testimony regarding part of a statement appellant gave to the police, the court erred in not allowing the introduction of the rest of the statement.

Finding no reversible error, we shall affirm the Circuit Court judgment.

## BACKGROUND

Amir was born on December 14, 2013. Appellant was his father; Asli Iman was his mother. The couple were not married and, until Amir was born, did not live together. Although the pregnancy was not planned, Ms. Iman was happy with it. When appellant was informed, he told Ms. Iman that "[h]e did not want me to have the baby. He wanted me to have an abortion," which she refused to do. The pregnancy was uneventful. Ms. Iman received prenatal care, but the delivery was through a C-section. Although appellant was present at the birth, Ms. Iman said that he contributed nothing during her pregnancy and "never bought a single item for the child at all." About two weeks after

Amir's birth, the family moved in with appellant's mother.  The mother used a bedroom on the first floor of the house.  Appellant, Ms. Iman, and the baby used the two bedrooms on the second floor.

Ms. Iman returned to work three weeks after Amir's birth.  Appellant's mother also worked.  Appellant, who neither worked nor attended school, watched Amir during the day.  Ms. Iman usually left the house around 6:00 a.m. and returned between 6:30 and 7:00 p.m.  Upon her return, she watched the baby until she went to bed around 11:00.  She would then wake appellant to let him know that the baby was asleep.  Ms. Iman testified that the child was in perfect health and had been seen by a pediatrician and a WIC unit.[1]

During the time the family was together, there were three disturbing incidents involving appellant and Amir.  On one occasion, Ms. Iman placed Amir on a downstairs couch while she was folding clothes.  She went upstairs to get some more clothes, and, when she returned, appellant acknowledged sitting on Amir, saying he did not see him.  The child was not injured.  On a second occasion, while on a bus with Amir, Ms. Iman prepared to give him a bottle and noticed that his upper gum was bruised.   She texted appellant to inquire and was told that, while sleeping, appellant had "elbowed" the baby.

Near the end of January, appellant awakened Ms. Iman and told her that, while trying to give Amir a bath, he nearly dropped the baby into the bathtub.  Appellant said

---

[1] The WIC (Women, Infants, and Children) Program is a Federally-funded program that provides healthy foods and nutrition counseling to pregnant women, new mothers, infants, and children under five.

that, to break the fall, he grabbed Amir by the head or face, with the child's body dangling down, and acknowledged that he "almost killed my son." During that episode, the child's head hit a towel rack. Ms. Iman noticed that the whole left side of Amir's face was bruised. She treated the bruise with an ice pack and a day or two later took him to a health care center where he was examined by a nurse and released.

The events leading to this case occurred on the evening of February 3-4, 2014, when Amir was seven weeks old. After returning home from work, Ms. Iman fed Amir, gave him a bath, and held him while watching television until 11:00, when she put him in his basinet and informed appellant that she was going to bed. Ms. Iman said that Amir was fine at that time – he was eating and fell asleep as usual.

Around 2:00 a.m., appellant awakened her. She went to Amir, saw that he was "lifeless," had blood coming out of his nose, and picked him up. She then noticed that he had on only a diaper and one sock, which were not the clothes she had put him to bed with. His lips were so blue that she put him on the floor and began CPR.[2] She started with infant CPR but when she blew breath in him and pushed on his chest, blood bubbles emerged from his mouth. She then commenced adult CPR while appellant watched. When she asked appellant what had happened, he replied that he was in the shower and didn't know. Eventually, appellant called 9-1-1 and advised Ms. Iman to get dressed. He then took over the CPR.

---

[2] Ms. Iman was trained as a medical assistant and was certified in CPR and infancy care.

The first assistance to arrive was Amos McPherson, an EMT. He picked the baby up, saw no chest rise, and immediately started CPR. He noticed blood and some clear fluid coming from one of the child's nostrils and summoned the paramedics, who were outside. Paramedic Mark Grant entered the home and started CPR. The baby had no pulse, and the paramedics were unable to intubate Amir or establish access for an IV line. When they attempted to insert a laryngoscope, they observed blood in the airway and were unable to see the vocal cords. They transported the child to Holy Cross Hospital.

Appellant followed the medical unit to the hospital in the back of a fire truck. During the trip, he told one of the firefighters, Russel Miles, that he had fed Amir and, when finished, wrapped him in some blankets and put him in the basinet. The baby made some "whimpering noises" for a while but then was silent. Appellant checked on him about 15 minutes later and saw blood coming from his nose. The baby was unresponsive and not breathing. Appellant said that he then called 9-1-1 and started CPR.[3]

Amir arrived at the hospital around 4:00 a.m. Dr. Mark Roddy, an attending physician at the pediatric emergency department, observed that Amir was not breathing or moving and appeared to be blue in the face. The staff was able to resuscitate him and get a spontaneous heart rate, but, as the hospital had no intensive care unit for children, it transported Amir to the Children's National Medical Center, where he spent about two

---

[3] With some modifications, appellant repeated that statement to Police Sergeant Kenneth Musgrave in the emergency room at the hospital. He told Sergeant Musgrave that he heard Amir fussing and went to feed him, but the baby did not want the bottle, so he put him back in the basinet and went to lie down in another room. When he returned to check on the child about 20 minutes later, he saw blood coming from Amir's nose, at which point he awakened Ms. Iman, who took over the CPR, and he then called 9-1-1.

4

months but then was moved for a while to a hospice. He later was transferred back to the Medical Center because he was still on life support and a breathing ventilator.

Amir received a variety of medications -- to regulate his breathing, to prevent seizure, for muscle spasms and stool softeners, and to regulate his heartbeat and body temperature – and he had a feeding tube. Still, he was not stable. Ms. Iman testified that, during the time Amir was at the Medical Center, appellant "wasn't even in the room . . . [but was] about in the hallway, and then sometimes he would go into the conference rooms on his phone."

Ms. Iman was shown a CAT scan of Amir's brain so she could see the significant damage to her son's brain. After struggling with the decision and upon the recommendation of the doctors, who believed that Amir would never recover, she agreed to have him taken off life support. Appellant initially objected to that, but he was incarcerated at that point and was not part of the decision. Amir died three days after the withdrawal of life support.

DISCUSSION

**Instructions on Second-Degree Murder**

Murder is a single common law crime in Maryland that has been defined as "the killing of one human being by another with the requisite malevolent state of mind and without justification, excuse, or mitigation." *Ross v. State*, 308 Md. 337, 340 (1987); *Harrison v. State*, 382 Md. 477, 488 (2004). By statute, the crime has been divided into two degrees for purposes of punishment. *Burch v. State*, 346 Md. 253, 274 (1997). All murder – first and second-degree – requires proof of malice. *Gladden v. State*, 273 Md.

5

383, 388 (1974). As related to murder, malice has been defined as "the intentional doing of a wrongful act to another without legal excuse or justification" and as including "any wrongful act done willfully or purposely." *Id*., quoting from *Chisley v. State*, 202 Md. 87, 105 (1953). The *Gladden* Court confirmed that malice may be express or implied from the circumstances, that a specific intent to kill is not necessary, and that malice may be implied "from the attendant circumstances in some unintentional killings." *Id.*

Malice is a malevolent state of mind. The kinds of malevolent states of mind that qualify for murder are "(1) the intent to kill, (2) the intent to do grievous bodily harm, (3) the intent to do an act under circumstances manifesting extreme indifference to the value of human life (depraved heart), or (4) the intent to commit a dangerous felony." *Harrison v. State*, *supra*, 382 Md. at 488. In *Burch, supra*, 346 Md. at 274, the Court applied these principles specifically to second-degree murder, declaring:

> "Second degree murder embraces a killing accompanied by any of at least three alternative *mentes reae* [guilty mind]: killing another person (other than by poison or lying in wait) with the intent to kill, but without the deliberation and premeditation required for first degree murder; killing another person with the intent to inflict such serious bodily harm that death would be the likely result; and what has become known as depraved heart murder – a killing resulting from 'the deliberate perpetration of a knowingly dangerous act with reckless and wanton unconcern and indifference as to whether anyone is harmed or not.'" (citations omitted).

and

> "As Judge Moylan pointed out in [citations omitted], the intent to inflict serious bodily harm and the recklessness required for depraved heart murder have been regarded as a form of malice, sufficiently blameworthy in the eyes of the law to cause the homicidal conduct to constitute murder."

6

The Circuit Court initially had some difficulty explaining this to the jury in its instructions on second-degree murder. Ultimately, it informed the jury that there were three possible intents that would suffice to constitute second-degree murder and explained what they were.[4] The court instructed that, for a juror to find guilt, he or she had to find beyond a reasonable doubt each of the elements of the intent he or she believed applicable – that a juror could not mix the elements of one intent with the elements of another. Appellant did not object to those instructions. The issue before us stems from the further instruction that all 12 jurors did not have to agree on the specific intent possessed by appellant so long as all 12 found beyond a reasonable doubt the elements of at least one of them – that some could find all of the elements of an "intent to kill," others could find the elements of an intent to inflict serious bodily harm, and others could find the elements of depraved heart.

Appellant complains that those instructions "conflate[s] three separate offenses, treating them as a single crime, and improperly permitted the jury to render a seemingly unanimous verdict without ensuring actual juror unanimity as to the elements of a single charged offense." That argument, in an analogous context, was considered and rejected by the Supreme Court in *Schad v. Arizona*, 501 U.S. 624 (1991) and, relying in part on *Schad*, by the Court of Appeals in *Crispino v. State*, 417 Md. 31, 47-49 (2010).

*Schad* involved a conviction for first degree murder in Arizona. That State, like Maryland, treated murder as a unitary crime divided into two degrees and regarded as

---

[4] It does not appear that second-degree felony murder was an issue in the case.

alternative *mentes reae* for first-degree murder a premeditated homicide and a killing committed in the course of certain enumerated felonies. The issue before the Supreme Court relevant here was whether jury instructions that did not require unanimous agreement on which *mens rea* the defendant possessed were Constitutionally deficient.

Both theories had been advanced at trial. The trial court instructed the jurors that either would constitute first-degree murder and that all 12 had to agree on a verdict, but it did not instruct that all 12 had to agree on the particular *mens rea* possessed by the defendant. Against the same argument made here, the Arizona Supreme Court affirmed, holding that, although a defendant is entitled to a unanimous verdict, he or she is not entitled to unanimity on the precise manner in which the act was committed, and the Supreme Court affirmed.

In a plurality Opinion by Justice Souter, for himself, Chief Justice Rehnquist, and Justices O'Connor and Kennedy, and over a dissent by Justices White, Marshall, Blackmun, and Stevens, the four Justices first observed that it was a "long-established rule of criminal law that an indictment need not specify which overt act, among several named, was the means by which a crime was committed" and that the Court had "never suggested that in returning general verdicts in such cases the jurors should be required to agree upon a single means of commission." *Id.* at 631. Those cases, the plurality said, involved alternative ways of proving *actus reus* but there was no reason "why the rule that the jury need not agree as to mere means of satisfying the *actus reus* element of an offense should not apply equally to alternative means of satisfying the element of *mens rea.*" *Id.* at 632.

8

Having reached that conclusion, the plurality Opinion acknowledged that there were due process limits on a State's ability to define different courses of conduct or states of mind as merely alternative means of committing a single offense and offered two analytical considerations for determining those limits – whether the State's particular way of defining a crime has a long history or is in widespread use and whether there was some "moral equivalence" in the alternative methods. The plurality concluded that the Arizona approach (which is Maryland's approach) satisfied both of those tests, holding, as to the first, that "there is sufficiently widespread acceptance of the two mental states as alternative means of satisfying the *mens rea* element of the single crime of first degree murder to persuade us that Arizona has not departed from the norm." *Id.* at 642. With respect to the second consideration – moral equivalence – the Opinion said that "[i]f, then, two mental states are supposed to be equivalent means to satisfy the *mens rea* element of a single offense, they must reasonably reflect notions of equivalent blameworthiness or culpability, whereas a difference in their perceived degrees of culpability would be a reason to conclude that they identified different offenses altogether. Petitioner has made out no case for such moral disparity in this instance."

Justice Scalia, concurring in the judgment, took issue with the plurality's reliance on moral equivalence and its view that "neither the antiquity of a practice nor the fact of steadfast legislative and judicial adherence to it through centuries insulates it from constitutional attack." Although acknowledging that may be true with respect to some Constitutional attacks, he found the plurality's approach wanting in a due process context. He asserted that a "'[f]undamental fairness' analysis may appropriately be

9

applied to *departures* from traditional American conceptions of due process" but not "an American tradition that is deep and broad and continuing."  *Id.* at 650 (Emphasis in original).  In short, he agreed with the plurality's view based on the "endorsement of history," thereby supplying the fifth vote for that approach.

The Supreme Court confirmed *Schad* in *Richardson v. United States*, 526 U.S. 813 (1999).  The issue there was whether, in a prosecution for engaging in a continuing criminal enterprise (21 U.S.C. §848), the jury had to agree not only on whether there was a continuing series of violations but also on the individual violations that comprised the continuing series, and the Court held in the affirmative.

The Court distinguished that case from *Schad*, citing *Schad* for the proposition that a Federal jury "need not always decide unanimously which of several possible sets of underlying brute facts make up a particular element, say, which of several possible means the defendant used to commit an element of the crime," adding that "[w]here, for example, an element of robbery is force or the threat of force, some jurors might conclude that the defendant used a knife to create the threat; others might conclude he used a gun.  But that disagreement – a disagreement about means – would not matter as long as all 12 jurors unanimously concluded that the Government had proved the necessary related element, namely, that the defendant had threatened force."  *Id.* at 817.

Explaining the distinction with *Schad*, the Court noted that there was no evidence of any Congressional intent to treat the continuing criminal enterprise statute as viewing the individual violations as merely a means of violating the law; nor was there any tradition of that approach.  Using essentially the *Schad* analysis, the Court concluded that

10

the statute required unanimity as to each alleged violation. There was no "endorsement of history."

Buoyed by *Richardson*, defendants (including appellant) have asserted that *Schad* was effectively overruled by that case. That argument has been rejected. *See Reed v. Quarterman*, 504 F.3d 465 (5th Cir. 2007). There is a solid basis for its rejection. There is nothing in the *Richardson* Opinion that in any way purports to overrule *Schad*. The *Richardson* Court distinguished *Schad* on its facts but clearly cited it with approval. Appellant relies on *Richardson* but ignores *Schad*, declining even to cite it in his brief. That is- surprising, and frankly disturbing, in light of *Crispino v. State, supra*, 417 Md. 31, which also is not cited, though it clearly is on point. *See* Md. Rule 19-303.3(a)(3).

Crispino was charged with child sexual abuse based on evidence of two incidents of "French kissing" and two incidents of cunnilingus. Citing *Richardson*, he complained on appeal that the trial court refused to give a jury instruction requiring unanimity on the specific act that formed the basis for its verdict. Citing *Schad*, the Court rejected that argument, holding that "[t]he concept that jurors need not be unanimous with regard to a specific act, but rather, whether all elements of an offense are proven is well-settled" and, quoting from Justice Scalia's concurring Opinion, agreed that "it has long been the general rule that when a single crime can be committed in various ways, jurors need not agree upon the mode of commission." *See also Rice v. State*, 311 Md. 116 (1987).

The *Schad* analysis and holding, applied in *Schad* to the two alternative *mentes reae* of first degree murder, apply equally to the three alternative *mentes reae* of second-

11

degree murder at issue in this case. So long as all jurors find all of the elements of any one of those alternatives to have been proved beyond a reasonable doubt, a guilty verdict of second-degree murder will stand, notwithstanding that some jurors may have found an intent to kill while others found an intent to commit grievous bodily harm or the elements of depraved heart murder. That was the essence of the instruction given in this case.

**Sufficiency of the Evidence**

Appellant contends that the evidence was legally insufficient to sustain a conviction for either second-degree murder or for the three counts of child abuse. We have already described what needs to be proved to warrant a conviction for second-degree murder – killing another person with the intent to kill or the intent to inflict such serious bodily harm that death would be the likely result, or a killing resulting from the deliberate perpetration of a knowingly dangerous act with reckless or wanton unconcern and indifference as to whether anyone is harmed.

The crime of child abuse also is divided into degrees, the elements of which are defined in Md. Code, §3-601 of the Criminal Law Article. "Abuse" is defined as "physical injury sustained by a minor as a result of cruel or inhumane treatment or as a result of a malicious act under circumstances that indicate that the minor's health or welfare is harmed by the treatment or act." As relevant to this case, first-degree child abuse includes a parent causing abuse to a minor that results in the death of the minor or causes severe physical injury to the minor. Second-degree abuse includes a parent causing abuse to a minor. Severe physical injury includes brain injury or bleeding within

the skull and physical injury that creates a substantial risk of death or loss or impairment of the function of any bodily member or organ.

The standard for determining the legal sufficiency of evidence is whether, taking the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. It is for the trier of fact, not us, to draw inferences and determine the credibility of witnesses. *Perry v. State*, 229 Md. App. 687, 696-97 (2016).

There was a great deal of medical evidence regarding the nature and extent of Amir's injuries, particularly injuries to his brain. We need not recount it all in detail. Although witnesses produced by the defense opined that those injuries could have been natural or accidental, the jury obviously did not credit that evidence; nor was it required to do so. There was ample evidence from the State, through Doctors Jackson, Murnich, and Miller that the injuries to Amir's brain and eyes were recent, severe, and traumatic, and arose from violent and repeated shaking or direct impact of the head against a hard or soft surface. Dr. Murnich stated that, when he sees "severe trauma like this," he thinks of" a high-speed motor vehicle crash" and not "an ordinary household accident." Dr. Jackson described what she saw as "violent, repetitive shaking of, of a baby" and "[t]his is not the kind of gentle tussling or bouncing of a baby."

That evidence clearly sufficed to show (1) for purposes of second-degree murder, an intent to kill, an intent to inflict such serious bodily injury that death would be the likely result, or the deliberate perpetration of a knowingly dangerous act with reckless or wanton unconcern and indifference as to whether Amir would be harmed, and (2) for

13

purposes of child abuse, serious physical injury sustained by a minor as a result of cruel or inhumane treatment or a malicious act under circumstances indicating that the child's health or welfare is harmed or threatened by the act or treatment.

The evidence also was overwhelmingly sufficient to show that appellant was the parent who caused those injuries.  Dr. Jackson testified that Amir's brain injury would have caused immediate symptoms, and his ability to suck and swallow would have been affected.  When Ms. Iman put Amir to bed at 11:00 after feeding and bathing him, the child appeared to be fine.  There was no blood in his nose; he wasn't blue or non-responsive; he was able to suck and swallow.  The only contact that the child had prior to appellant waking Ms. Iman at 2:00 a.m. was with him.  He alone had the opportunity to cause the damage during that three-hour period.  Deliberation and malicious, cruel, inhumane intent may be inferred from that circumstance and from the nature and severity of the injuries inflicted.

### Testimony Regarding Appellant's Desire That Pregnancy Be Aborted

Appellant moved *in limine* to exclude Ms. Iman's expected testimony that, upon learning that she was pregnant, appellant wanted her to have an abortion.  He claimed that the testimony would be irrelevant and unduly prejudicial.   That motion was denied.  When that testimony was presented at trial, however, no objection was made.  His complaint, therefore, has been waived.  *Reed v. State*, 353 Md. 628, 637 (1999); *Brown v. State*, 373 Md. 234, 242 (2003).[5]

[5] Later in the trial, in his own testimony, appellant admitted discussing with Ms. Iman whether to continue the pregnancy, noting that he was already under an obligation

14

## Failure to Admit Entirety of Appellant's Statement to Police

While at Children's Hospital on February 4, appellant was interviewed by two detectives whose names he could not remember. That interview was audio-recorded and a transcript was made of the recording. During the first part of that interview, appellant was asked about, and recounted, at least some of what had happened. He denied causing any harm to Amir. Prior to that interview – while Amir was still at Holy Cross Hospital – a doctor had indicated that Amir had a skull fracture, which, following a subsequent CAT scan, was shown to be incorrect; there was no fracture. Appellant was asked about that as well.

During cross-examination of appellant, the prosecutor inquired about the conversations appellant had with Firefighter Miles while in route to Holy Cross Hospital, with Sergeant Musgrave at that hospital, and with two detectives at Children's Hospital. With respect to the conversation that occurred at Children's Hospital, the prosecutor asked about statements appellant had made during the first part of the interview, referencing the first 12 pages of the transcript of that conversation, up to the mention of the inaccurate indication of a skull fracture. Neither the transcript nor the audio recording was placed in evidence or quoted during the cross-examination; nor were they marked for identification and included in the record. The focus of the cross-examination was to point out inconsistencies between statements made during that interview and his

_____

to support two children he had from another relationship. He stated that, in the end, they agreed to have the pregnancy continue.

15

trial testimony, mostly with respect to things to which he testified but never disclosed to the detectives.

At the conclusion of the cross-examination, defense counsel moved to admit the entire audio recording "under the rule of completeness." The prosecutor objected on the ground that her inquiry had been limited to inconsistencies between appellant's statements to the detectives prior to any mention of the alleged skull fracture and his testimony – statements he included in his testimony but acknowledged had not been disclosed to the detectives. That is classic impeachment. It appears that what appellant wanted was to introduce his self-serving hearsay denials of accusations thereafter made by the officers, particularly those concerning the inaccurate indication of a skull fracture. When asked what the defense wanted to add, counsel said:

> "It's the police officers' accusations against him in the way that he is further explaining things and consistent with him saying I didn't do anything. I don't know what happened. It's consistency despite their further accusations and the further information which then, when that information turns out to be false about the skull fracture, it's clear that he had been consistent that that's why he didn't know what had happened to the skull fracture because there wasn't, in fact, a skull fracture."

The court responded that none of that amounted to "telling the rest of the story" or explaining why he failed to tell the detectives things to which he testified in court, which was the only subject of the cross-examination – to ferret out things he was saying for the first time. The court denied appellant's motion, concluding that "this doesn't call for completeness," adding "It's not like he, they only got half the story from him and now we're keeping that from the jury."

16

Md. Rule 5-106, with one exception not relevant here, codifies the common law doctrine of verbal completeness. *Conyers v. State*, 345 Md. 525, 540 (1997). It provides:

> "When part or all of a writing or recorded statement is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it."

We are dealing here with a recorded and transcribed statement, none of which was introduced into evidence. Part of it was used as a reference for cross-examination but never quoted or introduced. Moreover, although the statement presumably was supplied to appellant in discovery (*see* Md. Rule 4-263(d)(1)), there was no proffer, other than what is recounted above, of what the balance of the statement that appellant sought to introduce said, nor was it included in the record before us, even as merely marked for identification. No attempt was made to inquire on re-direct examination about any further statements made by appellant to the officers.

In her classic treatise on Maryland evidence law, Professor Lynn McLain, citing *Conyers v. State, supra*, notes:

> "The rule of completeness does not provide a bootstrap for the admission of otherwise improper evidence. If there is a ground of objection to the part of the statement offered under the rule of completeness, which did not apply to the part of the statement admitted on direct examination, the court should exclude it, unless its explanatory value outweighs the danger of prejudice from its admission."

Lynn McLain, *Maryland Evidence State and Federal,* 2nd ed. 2001, § 106.1 at 169.

Here, we have no practical ability to determine, other than from the brief and unenlightening characterizations of counsel, what precisely the balance of the recorded statement would have revealed – what questions and answers were recorded that, in

17

fairness, should have been available to the jury.  All that appears from the colloquy between counsel and the court is that, in other parts of the interview, appellant denied any wrongdoing, which, on its face, does nothing to add context to what he *didn't* tell the detectives.  On the record before us, we find no error in the court's ruling.

**JUDGMENTS AFFIRMED; APPELLANT TO PAY THE COSTS.**

18